UNITED STATES DISTRICT COURT
FOR EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNLUCKY FILM INC.,
a Michigan Corporation,

    Plaintiff,                              Case No.

v.                                         Hon.

RED HAWK FILMS, INC.,
a New York Corporation,

    Defendant.

_____/

HOWARD & HOWARD ATTORNEYS PLLC
By:  Michael O. Fawaz (P68793)
       Jonathan W. Fountain (P63899)
       Joanna M. Myers (to be admitted)
Attorneys for Plaintiff
450 West Fourth Street
Royal Oak, MI 48067
P: (248) 645-1483
Email:  mof@h2law.com
          jwf@h2law.com
          jmm@h2law.com
_____/

## COMPLAINT

1. Plaintiff, Unlucky Film Inc., ("Unlucky Film" or "Plaintiff") is a Michigan corporation with its principal place of business in Michigan.

2. Defendant Red Hawk Films, Inc. ("Red Hawk" "Defendant") is a New York corporation with its principal place of business in New York.

1

3.     On or about September 1, 2021, the parties entered into a Production Services Agreement (the "Contract") for the purposes of producing a non-fiction documentary (the "Picture") which centered on the wrongful criminal prosecution, conviction, and incarceration of Anthony Broadwater for rape, his subsequent exoneration and release from prison, and allegations that prosecutors and other local government officials engaged in a cover-up.  (**Exhibit 1**, Contract)

4.     The Contract referred to Unlucky Film as "Company" and Defendant Red Hawk as "Producer." *Id.* at introductory paragraph.

5.     Defendant consented to the exercise of personal jurisdiction over it in Michigan and that Michigan state and federal courts in Wayne County would have exclusive jurisdiction in any action seeking injunctive relief.  *Id.* at ¶ 13(e).

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different States and the amount in controversy exceeds the sum of $75,000.

## BACKGROUND

7.     Timothy Mucciante, sole shareholder and president of Unlucky Film, was formerly the executive producer of the feature film *Lucky*, based on Alice Sebold's memoir of the same name.

8.     Alice Sebold started writing *Lucky* in approximately 1995, and her memoir chronicled her reported sexual assault in Syracuse, New York's Thornden

Park, near the Syracuse University campus. The assault took place on the night of May 8, 1981, while she was walking home from her boyfriend's nearby apartment. At the time of the assault, Sebold was just completing her freshman year.

9. After the assault, Sebold reported the incident to campus security and then to Syracuse police. The investigation faltered because initially the officer taking the report doubted her credibility for unknown reasons, and the investigation was shelved.

10. As detailed in her book *Lucky*, in September 1981 Sebold returned to the Syracuse University campus to start her sophomore year. While walking on Marshall Street in Syracuse, she "felt" that she had just seen her attacker. Although Syracuse police officer Paul Clapper was only feet away from the encounter, Sebold did not report it to Officer Clapper, but instead sought out her writing professor, Tobias Wolff, to whom she reported the sighting. Wolff recommended that Sebold report the sighting to the police, which she did.

11. Anthony Broadwater, identified as Gregory Madison in the book *Lucky*, was arrested shortly thereafter. He was tried and convicted within the year and remained in prison until December 31, 1998, over 17 years after he was arrested. He remained listed on the New York sex offender registry until November 21, 2021, when his conviction was vacated, due to Mucciante's efforts.

12. After agreeing to executive produce a feature film also entitled *Lucky*,

but before production of the film started, Mucciante noticed several discrepancies in the story told by Sebold in her book *Lucky*.

13.     As a result of these discrepancies, Mucciante undertook an independent investigation at his own expense. Based on the preliminary results of the investigation, together with anonymous sources from the Syracuse area, Mucciante was concerned that the subject of the book, Anthony Broadwater, did not receive a fair trial.

14.     Shortly into the production process, in approximately January or February 2021, Mucciante realized that there were significant discrepancies which led him to investigate further as to whether or not the perpetrator named in the book, Gregory Madison (later found to be Anthony Broadwater) was afforded a fair trial.

15.     Multiple issues troubled Mucciante, including a bizarre scene from the book in which Alice Sebold identified the wrong person, but the district attorney decided to take the case to trial despite Sebold's faulty identification.

16.     On or about June 7, 2021, Mucciante was fired as the *Lucky* executive producer due to his reluctance to continue with his *Lucky* responsibilities.

17.     Mucciante, however, continued to be concerned about the possibility that the gentleman in the *Lucky* book, Gregory Madison (*i.e.*, Anthony Broadwater), did not receive a fair trial.

18.     In July 2021, Mucciante hired a private investigator in Syracuse. The

investigator quickly determined that Gregory Madison's real name was Anthony Broadwater.

19. Evidence further uncovered by the investigator revealed that Mucciante's suspicions were correct, and Madison/Broadwater likely did not receive a fair trial and was likely wrongfully convicted.

20. Upon receiving the report from the private investigator, Mucciante decided to make a documentary film with the title *Unlucky* to expose the due process errors in the Anthony Broadwater case and expose the miscarriage of justice.

21. To further that effort, Mucciante, through his nonprofit, paid the legal fees on behalf of Anthony Broadwater, which amounted to a total of $70,400.00, to help procure his release. The attorney hired to represent Anthony Broadwater was J. David Hammond of Syracuse.

22. In order to make the documentary, Plaintiff Unlucky Film contracted with Defendant Red Hawk of New York on a work-for-hire basis. (**Ex. 1,** Preamble; ¶ 2(a)).

23. Although the Contract refers to attachments, no attachments were provided nor agreed to by the parties as being part of the Contract. Work under the Contract did not commence until October 15, 2021, which was the first day of filming on the Picture.

24. Pursuant to the Contract, Defendant was to provide all production

services necessary for the production, completion, and delivery to Plaintiff Unlucky Film of the documentary film tentatively titled "Unlucky". (**Ex. 1,** ¶ 1(a)).

25. The Contract expressly stated, and Defendant agreed, that Defendant's efforts and creation of the documentary Picture (collectively, with all works, footage, and materials created therewith) constituted a work-made-for hire, with all rights in the Picture vesting immediately with Plaintiff Unlucky Film pursuant to the U.S. Copyright Act (17 U.S.C. § 201(b). (**Ex. 1,** ¶¶ 2(a)-(c)).

26. The Contract further provided that Defendant retained no rights in or to the Picture. (**Ex. 1,** ¶ 2(a)-(c)).

27. The Contract required, among other things, that Defendant seek approval of expenditures, staff hires and all production aspects from Plaintiff. The Contract also required Defendant to provide production account reports on a regular basis. (**Ex. 1**, ¶ 1(d)).

28. The Contract also required Defendant to pay all bills/expenses associated with the production from funds supplied by Plaintiff. *Id.*

29. Plaintiff caused to be paid to Defendant and/or made payments on Defendant's behalf totaling over $130,000.

30. Additionally, Plaintiff directly or through its authorized agents paid film editor Bo Mehrad, $12,800, including out-of-pocket and travel expenses that Defendant was obligated to pay pursuant to the Contract. (**Ex. 1,** ¶ 4).

31. However, the majority of the money paid to Defendant Red Hawk by Plaintiff went to Scott Rosenbaum, Chief Executive Officer of Red Hawk and Tony Grazia, a producer employed of Red Hawk.

32. In January 2022, Defendant Red Hawk finally provided a production cost report, encompassing funds received and expenses.

33. The production cost report did not comport to any known accounting standard, and included documents that appear to have been fraudulently created and/or expenses that appear to have been fraudulently authorized. In addition, there were listed expenses that were not authorized or pre-approved as required by the Contract.

34. After backing out the unapproved expenses and the apparently fraudulent expenses, Defendant could only account for a portion of the over $130,000 that had been paid to it or on its behalf by Plaintiff.

35. In reviewing the invoices from Defendant, it was clear that some of the costs listed in the invoices were for employees with essentially "no-show" type jobs.

36. Specifically, the "no-show" employees were added to the payroll solely to generate an appearance of gender and ethnic diversity by Defendant. These individuals (including one who was Grazia's own wife), were a female (with no film or entertainment experience), an African American with no connection to the Picture, and a Hispanic professor.

7

37. When questioned about these costs, Rosenbaum and Grazia both expressly admitted that they were essentially "token" hires for Defendant to achieve the appearance of diversity and to "check the boxes."

38. Given the rampant fraud and the breach of contract by Defendant, Plaintiff terminated the Contract with Defendant on or about February 1, 2022.

39. By the time of termination, there had been nearly 70 hours of footage that had already been filmed.

40. Under the Contract, Plaintiff Unlucky Film possessed sole ownership rights to all footage and to the terms and conditions under which the footage could be used or distributed:

> (a) Producer shall produce the Picture and all constituent elements thereof as works made-for-hire specially ordered or commissioned by Company with Company being deemed the sole author of all such results and proceeds. Company shall be the sole and exclusive owner of, and Producer hereby grants, assigns and transfers to Company, all rights in and to the Picture, and all copyrights therein, including, without limitation, all of Producer's right, title and interest in music included in the Picture, and all underlying works, including without limitation, the scripts, and all the results and proceeds of Producer's and all other persons' services engaged in connection with the Picture and, without limiting the generality of the foregoing, Company shall have the sole and exclusive right to distribute, use, transmit, display, exhibit, exploit, project, license, simulcast, advertise, promote, publicize, perform and otherwise turn to account (hereinafter collectively "Distribution" and/or "Distribute" as applicable) the Picture (in whole or in part) in any and all forms, manner and media, whether now known or hereafter devised, in perpetuity and throughout the universe in all languages in such a manner and to the extent, if at all, as Company in its sole and unfettered discretion shall determine. . . . All of Company's rights under this Agreement shall vest in Company immediately and

shall remain perpetually vested in Company, its successors and assigns, whether this Agreement expires in its normal course or is terminated in whole or in part for any reason whatsoever.

(**Ex. 1**, ¶ 2(a)).

41. Upon termination of the Contract between Plaintiff and Defendant, Plaintiff demanded possession of all constituent elements of the Picture including, without limitation, that Defendant provide Plaintiff with all drives, footage, and other documents. Defendant Red Hawk refused to abide by the terms of the Contract.

42. Instead, Defendant claimed that another almost $100,000 was owed to it, and it refused to provide the Picture and materials related thereto to Plaintiff.

43. Defendant was owed and is owed no further sums.

44. Not only did Defendant refuse to provide all materials and film footage to Plaintiff, Defendant began sharing the materials and film footage with third parties in an unauthorized effort to market, sell, and license Plaintiff's property to third-party production companies and streaming services.

45. Defendant's sharing of Plaintiff's proprietary materials and film footage also violated the Contract.

46. The Contract provides for strict confidentiality:

Producer acknowledges that the subject matter of the Picture is of a confidential nature. Producer shall not issue, or authorize or permit the issuance of, any publicity or grant any interview or make any statements relating to Company, the Picture or Producer's services under this Agreement unless the same are first approved in writing by Company. "Confidential Information" means such information

9

(irrespective of the form and/or timing of communication) as is deemed by Company to be proprietary and is disclosed to Producer or Producer's Representatives (as defined below), or becomes known to Producer or Producer's Representatives, as a consequence of or through Producer's past, present, or future relationship or engagement with Company, including, without limitation, any information prepared by Producer or Producer's Representatives that contains (or is based on), in whole or in part, any such information, and specifically including, without limitation, interviews, research, facts, documents, writings, notes and other information and materials related to the subject matter of the Picture. "Producer's Representatives" means all of Producer's directors, officers, employees, subcontractors, representatives, agents, and those engaged by Producer in connection with the Picture. **Except as required in connection with the performance of Producer's obligations under this Agreement, Producer will not (and Producer will cause the Producer's Representatives not to), either during or after the term of this Agreement, use, publish, disseminate, distribute or otherwise disclose any Confidential Information without Company's prior written consent**. Producer will (and Producer will cause the Producer's Representatives to) take all steps necessary and/or reasonably requested by Company to ensure that all such Confidential Information is kept confidential and is held in trust in a fiduciary capacity for the sole use and benefit of Company. The provisions of this section will survive the expiration or earlier termination of this Agreement. Producer has executed, or will execute concurrently with the execution of this Agreement, Company's standard Non-Disclosure Agreement, which is hereby incorporated herein.

(**Ex. 1,** ¶ 8) (emphasis added).

47.   Strict confidentiality was an essential and indeed a critically material term of the Contract due to the highly sensitive nature of the Picture, a non-fiction documentary work, which includes footage from interviews with persons discussing facts and circumstances relating to Mr. Broadwater's alleged criminal activity, including allegations related to a possible conspiracy amongst government officials

to cover up Mr. Broadwater's wrongful arrest, conviction, and incarceration.

48. In addition to illegally shopping Plaintiff's confidential information, including Plaintiff's confidential footage, to prospective producing companies in derogation of Plaintiff's exclusive rights, Defendant has had unauthorized conversations with individuals involved in the Anthony Broadwater exoneration case. Upon information and belief, such conversations are presently ongoing and have disclosed or threatened to disclose confidential information contained in the footage.

49. Further, Defendant provided Plaintiff's confidential and proprietary film footage to its editor Bo Mehrad, who upon information and belief, still possess that confidential information.

50. Recently, Plaintiff learned that Defendant has provided links to third parties consisting of the confidential footage belonging to Plaintiff, thus allowing those third parties to view Plaintiff's highly confidential and proprietary materials and film footage.

51. Specifically, upon information and belief, Defendant sent production company Jigsaw hyperlinks allowing Jigsaw to view the confidential footage belonging to Plaintiff.

52. Plaintiff has been contacted by counsel for Jigsaw regarding Jigsaw's communications and relationship with Defendant, and Jigsaw has sought Plaintiff's

consent to use Plaintiff's confidential and proprietary film footage.

53. Counsel for Jigsaw has indicated that Jigsaw and Defendant are working together with HBO to develop a competing non-fiction documentary film project.

54. By illegally holding Plaintiff's confidential material hostage, and by disclosing footage to Jigsaw and possibly HBO and others, Defendant has deprived Plaintiff of the right to use, market, and complete its own Picture or to otherwise reap the economic benefits of its work.

55. Plaintiff has had to forsake several opportunities to work with major streaming services to produce the Picture because Defendant is holding the film footage hostage and illegally shopping it around for Defendant's own benefit.

56. For example, Hulu was interested in contracting with Plaintiff, but declined to do so because Plaintiff did not have access to its own footage and work product.

57. A British production company was also interested in contracting with Plaintiff to complete the Picture, but specifically backed out due to Plaintiff being unable to get its confidential materials returned to it from Defendant.

58. Recently, Plaintiff has entered into a letter of intent with a foreign news/production organization valued at several million dollars, where Plaintiff's backend is lucrative but unquantifiable. The third party letter of intent is contingent

and the relationship cannot proceed unless and until Plaintiff can obtain the return of its confidential and proprietary film footage from Defendant, Jigsaw, and anyone else to whom the footage has been unlawfully disclosed by Defendant.

59. Defendant, through Rosenbaum, has commented that they "wish [Mucciante] luck in his endeavors in figuring out how to do this on his own," knowing that the Picture cannot be made while Defendant holds the footage, hard drives and other documents and materials hostage.

60. Moreover, despite over 70 hours of footage having been filmed, Defendant has recently suggested there is only 20 hours of footage.

61. Thus, it appears Defendant is failing to safeguard Plaintiff's proprietary and confidential materials and/or is purposefully losing, destroying, disclosing, and/or otherwise harming Plaintiff's confidential information and irreplaceable intellectual property.

62. Despite Plaintiff being the exclusive holder of all copyrights and other intellectual property interests in the Picture and materials created under the Contract, Defendant is unlawfully holding the Picture hostage.

63. As a result of Defendant's unlawful refusal to turn over the Picture to Plaintiff, Plaintiff is unable to register its copyrights with U.S. Copyright Office.

64. The Picture is original, irreplaceable, and unique. Defendant's unlawful circulation of the Picture and the confidential information has, and will continue, to

cause irreparable harm.

## COUNT I – BREACH OF CONTRACT

65. Plaintiff restates and realleges the preceding paragraphs as if fully set forth herein.

66. The Contract between Unlucky Films and Defendant is a binding written contract. (**Ex. 1**).

67. The Contract provided that all materials created, all film footage, and all rights in "all constituent elements" of the *Unlucky* film were the sole ownership of Plaintiff Unlucky Film. (**Ex. 1** ¶ 2(a)).

68. The Contract provided that *any* rights that Defendant may have regarding any facet of the film are assigned and transferred to Plaintiff. *Id.*

69. The Contract provided that any distribution of any aspect of the film ("in whole or in part") was within the sole discretion and right of Plaintiff.

70. The Contract provided that all work created for the film was strictly confidential and could not be shared with anyone without Plaintiff's express preapproval. (**Ex. 1**, ¶ 8).

71. The Contract required that Defendant pay all expenses in connection with the production of the film. (**Ex. 1**, ¶ 4).

72. The Contract also required that every expenditure be itemized, receipts presented, and reports be furnished to Plaintiff. (**Ex. 1**, ¶ 1(d)).

73. Defendant breached the aforementioned contractual provisions, which were material to the Contract.

74. Defendant has held hostage all footage to the detriment of Plaintiff, despite Plaintiff having sole ownership.

75. Defendant did not pay expenses, with Plaintiff having to pay such expenses on Defendant's behalf.

76. Defendant breached confidentiality and shared footage in derogation of the Contract.

77. Plaintiff performed all material obligations under the Contract and has paid Defendant or on Defendant's behalf over $130,000.

78. Defendant's multiple breaches of the Contract are material breaches.

79. As a result of Defendant's material breaches, Plaintiff has been harmed and continues to be harmed.

## COUNT II – DECLARATORY JUDGMENT

80. Plaintiff restates and realleges the preceding paragraphs as if fully set forth herein.

81. A case or controversy has arisen between the parties.

82. Defendant has illegally retained proprietary material belonging to Plaintiff, has refused to return Plaintiff's property, has been engaging with third-parties to sell or use Plaintiff's exclusive and lucrative property, and has shared such

property with third-parties.

83. Defendant's conduct violates multiple provisions of the parties' Contract.

84. The Court must declare that Defendant's conduct violates the rights of Plaintiff, that Plaintiff is the sole owner of all footage and materials related to the *Unlucky* film, that Defendant must return Plaintiff's proprietary and confidential material, and Defendant must get any and all footage it shared with anyone and return it to Plaintiff.

## COUNT III – BREACH OF FIDUCIARY DUTY

85. Plaintiff restates and realleges the preceding paragraphs as if fully set forth herein.

86. Under the Contract, Defendant assumed a fiduciary obligation to hold in trust and confidence all confidential information belonging to Plaintiff. (**Ex. 1**, ¶ 8).

87. In sharing Plaintiff's confidential information for Defendant's own benefit, Defendant has breached its fiduciary duties.

88. Plaintiff has incurred harm and will incur ongoing harm in the future due to Defendant's breach of fiduciary duties.

89. In holding Plaintiff's confidential information hostage and sharing it with third-parties despite knowing that Defendant has no right to confidential

information, Defendant has acted with actual malice with an intent to harm Plaintiff or at least with reckless disregard for whether harm occurs.

90.    The Court can and should enjoin Defendant from benefitting by using Plaintiff's confidential information, compel Defendant to return all of Plaintiff's confidential information, including from any third-party with whom such information was shared, and order Defendant to account for all expenditures.

WHEREFORE, Plaintiff Unlucky Films prays for judgment in its favor including:

1) Compensatory damages in an amount in excess of $75,000;

2) Punitive damages for Defendant's willful and malicious breach of fiduciary duties as permitted under California law governing Plaintiff's substantive claims;

3) A preliminary injunction against Defendant and all those acting in concert with it, forbidding any use, sale, or distribution of Plaintiff's proprietary and confidential information, an order requiring Defendant to retrieve all of Plaintiff's confidential information from any source with whom Defendant has shared such information, and an order requiring all such information be returned to Plaintiff or submitted to a third-party for forensic analysis, with Defendant retaining no copies;

4) A permanent injunction;

5) Attorneys' fees as permitted under the Contract;

6) Costs as permitted under the Contract; and

7) And such further and additional relief as the Court deems just and appropriate.

DATED: January 19, 2024

Respectfully submitted,

HOWARD & HOWARD ATTORNEYS PLLC

 /s/Michael O. Fawaz
By:  Michael O. Fawaz (P68793)
       Jonathan W. Fountain (P63899)
       Joanna M. Myers (to be admitted)
Attorneys for Plaintiff
450 West Fourth Street
Royal Oak, MI 48067
P: (248) 645-1483
Email:  mof@h2law.com
             jwf@h2law.com
             jmm@h2law.com