UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **UNLUCKY FILM INC.,**<br>    Plaintiff,<br>vs.<br>**RED HAWK FILMS, INC.,**<br>    Defendant. | **2:24-CV-10149-TGB-EAS**<br>HON. TERRENCE G. BERG |

## DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES

Red Hawk Films, Inc. ("Red Hawk" or "Defendant") states as follows for its Answer and Affirmative Defenses to the Complaint filed by Unlucky Film Inc. ("Unlucky" or "Plaintiff"):

1.    Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint, and neither admits nor denies the allegations.

2.    Admitted.

3.    Admitted only that the parties entered into a "Production Services Agreement" ("Contract") and that Defendant intended to complete the "Picture" as set forth in the Contract. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning Plaintiff's purposes in entering into the

Contract. Further answering, the description of the Picture set forth in paragraph 3 of the Complaint is an incomplete description of the intended Picture.

4.    Admitted.

5.    Denied that paragraph 5 of the Complaint accurately states the agreement regarding personal jurisdiction set forth in the Contract. Further answering, the Contract speaks for itself, and the Contract contains an arbitration provision requiring that all claims for damages be submitted to binding arbitration.

6.    Defendant denies the allegations set forth in paragraph 6 of the Complaint. Further answering, the Contract contains an arbitration provision requiring that all claims for damages be submitted to binding arbitration. Absent the claims for damages, which must be arbitrated, the amount in controversy does not exceed $75,000. Even with the alleged damages, it is not clear that the amount in controversy exceeds $75,000 from the face of Plaintiff's Complaint.

## BACKGROUND

7.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint, and neither admits nor denies the allegations.

8.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint, and neither admits nor denies the allegations.

9.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint, and neither admits nor denies the allegations.

10.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint, and neither admits nor denies the allegations.

11.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint, and neither admits nor denies the allegations.

12.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint, and neither admits nor denies the allegations.

13.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint, and neither admits nor denies the allegations.

14.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint, and neither admits nor denies the allegations.

15.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint, and neither admits nor denies the allegations.

16.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint, and neither admits nor denies the allegations.

17.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint, and neither admits nor denies the allegations.

18.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint, and neither admits nor denies the allegations.

19.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint, and neither admits nor denies the allegations.

20.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint, and neither admits nor denies the allegations.

21.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint, and neither admits nor denies the allegations.

22.     Admitted only that Plaintiff contracted with Defendant. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning the intent of Plaintiff.

23.     Defendants deny the allegations set forth in paragraph 23 of the Complaint. Further answering: (a) although the first day of filming occurred on or about October 15, 2021, necessary preparatory work commenced well before that date; (b) the Contract speaks for itself.

24.     Defendants deny that the allegations contained in paragraph 24 of the Complaint are a complete and accurate representation of the Contract. Further answering, the Contract speaks for itself.

25.     Defendants deny that the allegations contained in paragraph 25 of the Complaint are a complete and accurate representation of the Contract. Further answering, the Contract speaks for itself.

26.     Defendants deny that the allegations contained in paragraph 26 of the Complaint are a complete and accurate representation of the Contract. Further answering, the Contract speaks for itself.

27.     Defendants deny that the allegations contained in paragraph 27 of the Complaint are a complete and accurate representation of the Contract. Further answering, the Contract speaks for itself.

28.     Defendants deny that the allegations contained in paragraph 28 of the Complaint are a complete and accurate representation of the Contract. The obligation of Defendant to pay expenses was contingent on Plaintiff fulfilling its obligations in paragraph 3 of the Contract to make advances according to the Budget, which Plaintiff failed and refuse to do. Further answering, the Contract speaks for itself.Further answering, the Contract speaks for itself.

29.     Denied because the allegations are not true.

30.     Denied because the allegations are not true as stated. Further answering, upon information and belief, a direct payment was

6

made to Mr. Mehrad from Plaintiff, but this was due to Plaintiff's failure to make advances as required under the Contract.

31.     Denied because the allegations are not true as stated. Further answering, the majority of money paid constituted costs for labor, subcontractors, and reimbursements for Red Hawk's expenses, including reimbursements of costs and expenses paid by Mr. Rosenbaum because Plaintiff failed to make timely advances as required under the Contract.

32.     Admitted only that in January 2022 Defendant provided a production cost report. Defendant disputes the characterization as set forth in paragraph 32 of the Complaint.

33.     Denied because the allegations are not true.

34.     Denied because the allegations are not true.

35.     Denied because the allegations are not true.

36.     Denied because the allegations are not true.

37.     Denied because the allegations are not true.

38.     Denied because the allegations are not true.

39.     Denied because the allegations are not true.

40.     Denied because the allegations are not true. Further answering, the allegations contained in paragraph 40 does not accurately represent either the quoted language of the Contract or the Contract as a whole. The Contract speaks for itself.

41.     Denied because the allegations are not true.

42.     Admitted only that Defendant sent a final statement for almost $100,000 for Defendant's work under the Contract, which Plaintiff failed and refused to pay; Plaintiff also owes additional amounts to compensate for Plaintiff's damages resulting from Plaintiff's breach of the Contract. Any remaining allegations are denied as stated.

43.     Denied because the allegations are not true.

44.     Denied because the allegations are not true.

45.     Denied because the allegations are not true and because Defendant did not share film footage or proprietary materials with third party production companies as alleged.

46.     Admitted only that the stated language is included in the Contract.

47.     Defendant denies the allegations set forth in paragraph 47 of the Complaint that strict confidentiality was an essential and/or

8

critically material term of the Contract for the reasons alleged in paragraph 47.

48.     Defendant denies the allegations concerning "illegally shopping Plaintiff's confidential information" set forth in paragraph 48 of the Complaint because the allegations are not true. Defendant neither admits nor denies the allegations concerning "unauthorized conversations" because the term is vague and undefined. The Complaint implies, without stating, that Defendant can have no conversations with certain individual without authorization from Plaintiff. Defendant denies any such implication because Defendant is not required to obtain authorization from Plaintiff to have conversations.

49.     Admitted only that film footage was provided to Mr. Mehrad as an editor working with Red Hawk in the ordinary course of Red Hawk's work under the Contract and with full disclosure to Plaintiff. Defendant denies all other allegations set forth in paragraph 49 of the Complaint.

50.     Denied because the allegations are not true.

51.     Denied because the allegations are not true.

52.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint, and neither admits nor denies the allegations.

53.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint, and neither admits nor denies the allegations.

54.     Denied because the allegations are not true.

55.     Denied because the allegations are not true.

56.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint, and neither admits nor denies the allegations.

57.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint, and neither admits nor denies the allegations.

58.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint, and neither admits nor denies the allegations.

59.     Denied because the allegations are not true.

60.     Admitted only that approximately 20 hours of footage has been captured consisting of interviews and b-roll footage. The remaining allegations are denied because the allegations are not true.

61.     Denied because the allegations are not true.

62.     Denied because the allegations are not true.

63.     Denied because the allegations are not true.

64.     Denied because the allegations are not true.

### COUNT I – ALLEGED BREACH OF CONTRACT

65.     Defendant restates and realleges the preceding paragraphs as if fully set forth herein.

66.     Admitted.

67.     Defendants deny that the allegations contained in paragraph 67 of the Complaint are a complete and accurate representation of the Contract. Further answering, the Contract speaks for itself.

68.     Defendants deny that the allegations contained in paragraph 68 of the Complaint are a complete and accurate representation of the Contract. Further answering, the Contract speaks for itself.

69.    Defendants deny that the allegations contained in paragraph 69 of the Complaint are a complete and accurate representation of the Contract. Further answering, the Contract speaks for itself.

70.    Defendants deny that the allegations contained in paragraph 70 of the Complaint are a complete and accurate representation of the Contract. Further answering, the Contract speaks for itself.

71.    Defendants deny that the allegations contained in paragraph 71 of the Complaint as stated; the obligation of Defendant to pay expenses was contingent on Plaintiff fulfilling its obligations in paragraph 3 of the Contract to make advances according to the Budget, which Plaintiff failed and refuse to do. Further answering, the Contract speaks for itself.

72.    Defendants deny that the allegations contained in paragraph 70 of the Complaint are a complete and accurate representation of the Contract. Further answering, the Contract speaks for itself.

73.    Denied because the allegations are not true.

74.    Denied because the allegations are not true.

75.    Denied because the allegations are not true.

76.    Denied because the allegations are not true.

77.    Denied because the allegations are not true.

78.    Denied that Defendant committed any breach of the Contract.

79.    Denied because the allegations are not true.

## COUNT II – PLAINTIFF'S RQUEST
## FOR DECLARATORY JUDGMENT

80.    Defendant restates and realleges the preceding paragraphs as if fully set forth herein.

81.    Admitted.

82.    Denied because the allegations are not true.

83.    Denied because the allegations are not true.

84.    Denied because the allegations are not true.

## COUNT III – ALLEGED BREACH OF FIDUCIARY DUTY

85.    Defendant restates and realleges the preceding paragraphs as if fully set forth herein.

86.    Denied because the allegations are not true.

87.    Denied because the allegations are not true.

88.    Denied because the allegations are not true.

89.    Denied because the allegations are not true.

90.    Denied because the allegations are not true.

WHEREFORE, Defendant respectfully requests that his Honorable Court dismiss the Complaint with prejudice, award Defendant its costs and reasonable attorneys' fees, and grant such other relief in favor of Defendant as is just and equitable.


HEILMAN LAW PLLC


Dated:  March 13, 2023                    By:   /s/ Ryan D. Heilman
                                          Ryan D. Heilman (P63952)
                                          Attorney for Defendant
                                          40900 Woodward Ave., Suite 111
                                          Bloomfield, MI 48304
                                          (248) 835-4745
                                          ryan@heilmanlaw.com

14

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **UNLUCKY FILM INC.,** | **2:24-CV-10149-TGB-EAS** |
| Plaintiff, | HON. TERRENCE G. BERG |
| vs. | |
| **RED HAWK FILMS, INC.,** | |
| Defendant. | |

## DEFENDANT'S AFFIRMATIVE DEFENSES

Further responding to Plaintiff's Complaint, Defendant, Red Hawk Films, Inc., asserts the following affirmative defenses:

1.    Plaintiff's claims in this Court are barred because the Contract contains an arbitration provision requiring that all claims for damages be submitted to binding arbitration. Absent the claims for damages, which must be arbitrated, the amount in controversy does not exceed $75,000. Even with the alleged damages, it is not clear that the amount in controversy exceeds $75,000 from the face of Plaintiff's Complaint.

2.    Plaintiff has failed to state a claim for breach of contract upon which relief may be granted.

3.     Plaintiff has failed to state a claim for equitable or injunctive relief upon which relief may be granted.

4.     Plaintiff has failed to state a claim for declaratory judgment upon which relief may be granted.

5.     Plaintiff has failed to state a claim for breach of fiduciary duty upon which relief may be granted.

6.     Plaintiff has failed to allege any recognizable and non-speculative damages.

7.     Plaintiff has failed to state a claim for the existence of any fiduciary duties owed by Defendant to Plaintiff, and in fact, the Contract did not create any fiduciary duties owed by Defendant to Plaintiff.

8.     Any claim that Plaintiff may have is barred due to Plaintiff's first material breach of the Contract. Plaintiff breached the Contract by failing to make payments and advances when due under the Contract and ignoring invoices submitted by Defendant.

9.     To the extent Plaintiff has any viable claims against Defendant, such claims are subject to setoff and recoupment against amounts owed by Plaintiff to Defendant.

16

10.    Any claim Plaintiff may have against Defendant is barred by Plaintiff's own illegal and unethical conduct and the doctrine of unclean hands.

11.    Plaintiff's claims regarding ownership rights in the Picture fail as a matter of law because the "Picture," as defined in the Contract, was never created. Defendant began shooting video to produce the Picture, but stopped doing so after Plaintiff failed and refused to make payments to Defendant or advance costs as required under the Contract and the agreed production budget. Because the Picture was never created, Plaintiff can have no rights in the Picture.

12.    The failure of Defendant to create the Picture was solely caused by Plaintiff's breach of the Contract. Accordingly, all Plaintiff's claims fail and are without merit due to Plaintiff's own conduct.

13.    To the extent Plaintiff argues it did not have payment obligations under the Contract, the Contract itself is void for lack of consideration.

14.    Plaintiff's claims are barred in whole or in part under the doctrines of equitable estoppel or promissory estoppel.

17

15.    Plaintiff's claims are barred in whole or in part to the extent that Plaintiff committed fraud in inducing Defendant to enter into the Contract. Defendant believes the evidence will show that Plaintiff lacked the financial ability to perform under the Contract and never intended to perform under the Contract.

16.    Plaintiff's claims are barred by the doctrine of laches.

17.    Plaintiff's claims for equitable relief are barred because any equitable relief granted to Plaintiff without payment in full of all amounts due to Defendant and all damages incurred by Defendant due to Plaintiff's breach of contract would unjustly enrich Plaintiff at Defendant's expense.

Defendant reserves the right to modify or add affirmative defenses that may become known through the course of its investigation and discovery in this action.

WHEREFORE, Defendant respectfully requests that his Honorable Court dismiss the Complaint with prejudice, award Defendant its costs and reasonable attorneys' fees, and grant such other relief in favor of Defendant as is just and equitable.

HEILMAN LAW PLLC

Dated:  March 13, 2023

By:   /s/ Ryan D. Heilman
Ryan D. Heilman (P63952)
Attorney for Defendant
40900 Woodward Ave., Suite 111
Bloomfield, MI 48304
(248) 835-4745
ryan@heilmanlaw.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **UNLUCKY FILM INC.,** | **2:24-CV-10149-TGB-EAS** |
| Plaintiff / Counter-Defendant, vs. | HON. TERRENCE G. BERG |
| **RED HAWK FILMS, INC.,** | |
| Defendant / Counter-Plaintiff. | |

## **COUNTERCLAIM**

Red Hawk Films, Inc. ("Red Hawk") states as follows for its Counterclaim against Unlucky Film Inc. ("Unlucky"):

### **Parties**

1.      Red Hawk Films, Inc. ("Red Hawk" "Defendant") is a New York corporation with its principal place of business in New York.

2.      Upon information and belief, Unlucky is a Michigan corporation with its principal place of business in Michigan.

### **Background**

3.      Red Hawk and Unlucky entered into a Production Services Agreement ("Contract") dated as of September 1, 2021. The Contract is attached as Exhibit A.

4.      Under the terms of the Contract, Red Hawk agreed to produce a certain documentary motion picture ("Picture") and Unlucky agreed to make payments and advance costs according to a budget to be prepared by Red Hawk ("Budget").

5.      The Picture was to tell the story of Anthony Broadwater's conviction for rape and eventual exoneration.

6.      Time was a critical factor in producing the Picture as court proceedings were on-going in October through December of 2021, and the parties intended that the Picture include footage of the court proceedings and witness interviews contemporaneous with the court proceedings.

7.      Red Hawk prepared and submitted the Budget, dated October 12, 2021, which was approved by Unlucky. The Budget contained total costs and expenses for completion of the Picture of $1,157,475.

8.      The Budget included an agreed production service fee for Red Hawk of $75,000 and a director fee of $100,000, each exclusive of out-of-pocket expenses and other fees and costs.

9.      Accordingly, Red Hawk's agreed total compensation for its

2

production services was $175,000.

10.    Red Hawk undertook extensive preparations for its work under the Contract, including contacting potential interviewees, scouting shooting locations, and retaining necessary subcontractors.

11.    Red Hawk began shooting video for the Picture in October, 2021 and continued through December 15, 2021.

12.    Red Hawk submitted invoices and correspondence to Unlucky beginning in October 2021 to cover Red Hawk's costs and expenses as well as a portion of Red Hawk's production service and director fees.

13.    Under the Contract, all fees, costs and expenses were to be advanced by Unlucky so that Red Hawk could make necessary payments to produce the Picture. Contract, ¶¶ 3-4.

14.    Red Hawk delivered the following invoices and statements of the amounts owed by Unlucky for services from September through December of 2021:

- October 4, 2021: Invoice 100421 - $20,290 (Exhibit B);

- November 12, 2021: Invoice 111221 - $94,050 (Exhibit C); and

3

- December 6, 2021: Invoice 120621 - $72,935 (Exhibit D).

15.     Unlucky received the invoices.

16.     The total charged for services from September through December of 2021 totaled $187,275.

17.     Unlucky did not object to the invoices or the amounts set forth in the invoices. Nor did Unlucky claim that any amounts set forth in the invoices were not due and owing with the exception only of line items for Co-producers in the amount of $5,000 in invoice 111221 and $12,500 in invoice 120621.

18.     Unlucky provided assurances to Red Hawk that payments would be made.

19.     On multiple occasions, Unlucky falsely claimed that it had electronically transferred payments to Red Hawk when no such payments had been made.

20.     Unlucky made these false statements to induce Red Hawk to continue working to produce the Picture notwithstanding Unlucky's refusal or inability to make payments as required under the Contract.

21.     Notwithstanding Unlucky's promises and false statements, and despite numerous requests by Red Hawk, Unlucky failed to pay or

advance the amounts owed as set forth in the invoices.

22.     Notwithstanding Unlucky's refusal to advance funds as required by the Contract, Red Hawk continued shooting video through December 2021 due to the necessity of obtaining film while the court proceedings were actually taking place.

23.     In continuing to work on producing the Picture and to shoot video, Red Hawk relied on the false statements made by Unlucky and Unlucky's owner, Timothy Mucciante, that payment in full would be forthcoming.

24.     Unlucky eventually made partial payment of the amounts owed to Red Hawk in December 2022 in the total amount of $89,893.12.

25.     In addition, at Red Hawk's insistence after Unlucky's repeated failures to make payments as promised, Unlucky made a direct payment to Borzu Mehrad, the editor subcontracted by Red Hawk, in the amount of $12,800.

26.     Because Unlucky breached its obligations to *advance* funds to Red Hawk, Red Hawk paid expenses out-of-pocket in order to continue shooting and used the partial payments from Unlucky to

reimburse these out-of-pocket expenses as well as for its contractually agreed compensation.

27.    Despite not objecting to the invoices or statements, Unlucky failed and refused to pay the remaining amounts set forth in the invoices.

28.    Because Unlucky had failed and refused to pay the amounts owed to Red Hawk for fees, costs and expenses already incurred, Red Hawk was unable to continue production and the Picture was never produced.

29.    Additionally, Unlucky refused to advance any funds as required by the Contract and Budget for work scheduled for January of 2022.

30.    Invoice 122821 details the payment amounts required for January 2022 in the amount of $92,925. Exhibit E.

31.    Due to Unlucky's failure to make required payments, Red Hawk canceled all January production, mitigating the costs, fees and expenses for the month from the budgeted amount of $92,925 to actual incurred fees of $30,625.

32.    The fees that were incurred for January consisted of the monthly Director Fee ($12,500), the Red Hawk production services fee ($9,375), and the Producer fee for a producer subcontracted by Red Hawk ($8,750).

33.    On February 2, 2022, after not receiving any payments, advances or reimbursements for over a full month, Red Hawk submitted a default and termination notice ("Default Notice"). Exhibit F.

34.    The Default Notice set forth a final statement of the amount then owed for services already provided and for costs and expenses already incurred from September 2021 through January 2022 in the amount of $97,435.

35.    The $97,435 set forth in the February 2, 2022 statement slightly understated the amounts then owed, calculated as follows:

- From September through December of 2021, Red Hawk incurred and invoiced actual fees, costs and expenses in the amount of $187,275.

- Unlucky objected to only the Co-producer line items of $5,000 and $12,500, leaving $169,775 in undisputed charges.

- Of this amount, Unlucky paid only $89,893.12 plus one direct payment of $12,800, for total payments of $102,693.12, leaving an undisputed but unpaid charge of $67,081.88.

- Additionally, Unlucky failed to make any January advance payments. After taking all reasonable steps to mitigate and reduce costs, the January fees were reduced from $92,925 to $30,625.

- Adding the January 2022 fees to the undisputed fees from September through December 2021 yields a total amount owed of **$97,706.88** as of February 2, 2022.

36.    Unlucky's failure to make these payments constituted a material breach of the Contract.

37.    Unlucky did not object to the statement in the Default Notice that $97,435 was due and owing nor did Unlucky challenge any portion of this $97,435.

38.    The February 2 2022 notice provided a deadline for payment of February 11, 2022, upon which date the contract would be terminated if payment was not received.

39.    Unlucky did not make payment by February 11, 2022.

40.    Accordingly, the Contract was terminated due to Unlucky's breach of contract.

41.    Unlucky has made no payments to Red Hawk since December 2021.

42.    Red Hawk complied with all its obligations under the Contract and even continued working to produce the Picture *after* Unlucky defaulted in its payment obligations, fronting costs and expenses that Unlucky was contractually required to advance.

43.    Without reimbursements for all costs and expenses incurred by Red Hawk or required advance payments, Red Hawk was not able to continue shooting video after December 2021 and the Contract was terminated effective February 11, 2022.

44.    As a result of Unlucky's breach of the Contract, the Picture was never produced.

## Count I – Breach of Contract

45.    Red Hawk incorporates each of the foregoing paragraphs as though fully set forth herein.

46.    Unlucky entered into the Contract with Red Hawk.

47.    Under the terms of the Contract, Unlucky was required to make payments and advances to Red Hawk to permit Red Hawk to produce the Picture.

48.    Unlucky breached the Contract by failing to make required payments and advances when due.

49.    As a result of Unlucky's breach of Contract, Red Hawk was unable to continue work on the Picture and ultimately the Picture was never produced and the Contract was terminated.

50.    If Unlucky had not breached the Contract, the Picture would have been successfully produced by Red Hawk, which would have likely received world-wide attention as evidenced by the media spotlight on the exoneration of Anthony Broadwater.

51.    Unlucky's breach of Contract has thus damaged Red Hawk due to the loss of reputation and opportunities that would have resulted from a successful completion of the Picture.

52.     Additionally, Red Hawk turned down other film opportunities to pursue the Picture with Unlucky, further increasing Red Hawk's opportunity costs and damages resulting from Unlucky's breach of Contract and the resulting inability to complete the Picture.

53.     As set forth above, Red Hawk invoiced a total amount of $169,775 for undisputed service fees, costs and expenses incurred from September through December of 2021, and an additional $30,625 for service fees incurred in January 2022, for total charges of $200,400.

54.     Of this amount, Unlucky paid only $89,893.12 and direct-paid $12,800, for total payments of $102,693.12, leaving total $97,706.88 due and owing as of February 2, 2022.

55.     The $169,775 in undisputed charges included exactly 50% of Red Hawk's agreed $100,000 director fee and Red Hawk's agreed $75,000 production services fee.

56.     Accordingly, in addition to charges for September 2021 through January 2022, Unlucky also owes Red Hawk $50,000 of the contractual director fee and $37,500 of the contractual production service fee, for total additional unpaid contractual fees of $87,500.

57.   After the termination of the Contract, Unlucky filed a lien against Mr. Mehrad, causing Mr. Mehrad to expend in excess of $5,000 in legal fees.

58.   Mr. Mehrad has demanded that Red Hawk reimburse him for these legal fees.

59.   The Contract provides that in the event of an action, the prevailing party shall be entitled to recover form the non-prevailing party the cost of reasonable attorneys' fees and expenses. Accordingly, Red Hawk is entitled to reimbursement not only of its own attorneys' fees and expenses, but also the attorneys' fees and expenses of Mr. Mehrad caused by Unlucky and charged back to Red Hawk.

WHEREFORE, Red Hawk respectfully requests that this Honorable Court enter judgment in favor of Red Hawk and against Unlucky

(a) in the amount of $97,706.88 representing unpaid invoiced amounts due and owing as of February 2, 2022, plus

(b) $87,500 for contractually required director and production services fees that Red Hawk would have earned had the Contract not been terminated as a result of Unlucky's breach, plus

12

(c) an amount sufficient to compensate Red Hawk for its reputational damages and loss of opportunities resulting from the termination of the Contract and failure to produce the Picture, plus

(d) reimbursement for Mr. Mehrad's attorneys' fees in an amount not less than $5,000, plus

(e) all pre and post-judgment interest, costs and reasonable attorneys' fees incurred by Red Hawk as a result of Unlucky's breach of contract and the filing of this action by Unlucky.

## COUNT II - ACCOUNT STATED

60.    Red Hawk incorporates each of the foregoing paragraphs as though fully set forth herein.

61.    This count is pleaded in the alternative.

62.    Red Hawk provided services on behalf of Unlucky and at Unlucky's request in the form of production services, director services, and payment of out-of-pocket costs and expenses towards completion of the Picture.

63.     Red Hawk submitted invoices and other correspondence to Unlucky providing statements of the amounts owed by Unlucky to Red

Hawk for Red Hawk's services and for advances and reimbursements of expenses.

64.     Red Hawk delivered the invoices and statements of the amounts owed by Unlucky for services from September through December of 2021 as set forth above.

65.     Unlucky received the statements.

66.     Unlucky did not object to the invoices or the amounts set forth in the invoices, with the sole exception of line items for Co-producers in the amount of $5,000 in invoice 111221 and $12,500 in invoice 120621.

67.     The total charged for services from September through December of 2021 equaled $187,275, and the undisputed amount equaled $169,775.

68.     Unlucky eventually made one direct payment and partial payments on the amounts owed to Red Hawk in December 2022 in the total amount of $102,693.12.

69.     Despite not objecting to the invoices or statements, Unlucky failed and refused to pay the remaining amounts set forth in the invoices in the amount of $67,081.88.

14

70.     Additionally, Unlucky refused to advance any funds as required by the Contract and Budget for work scheduled for January of 2022.

71.     On February 2, 2022, through the Default Notice, Red Hawk submitted a final statement of amounts owed through January 2022 in the total amount of $97,435.

72.     Unlucky also did not dispute the amount stated in the Default Notice or claim that any portion of this amount was not due and owing as of February 2, 2022.

73.     Accordingly, the account has become an account stated between Red Hawk and Unlucky in the amount of $97,435.

74.     Nevertheless, Unlucky failed and refused to pay the amounts required.

75.     Unlucky is liable under the account stated in the amount of $97,435, the amount of the last statement provided by Red Hawk to Unlucky on February 2, 2022.

WHEREFORE, Red Hawk respectfully requests that this Honorable Court enter judgment in favor of Red Hawk and against Unlucky in the amount of $97,435, plus all pre and post-judgment

15

interest, and costs and reasonable attorneys' fees incurred by Red Hawk as a result of Unlucky's breach of contract and the filing of this action by Unlucky.

## Count III – Promissory Estoppel

76.   Red Hawk incorporates each of the foregoing paragraphs as though fully set forth herein.

77.   This count is pled in the alternative.

78.   Red Hawk delivered the invoices and statements of the amounts owed by Unlucky for services from September through December of 2021 as set forth above.

79.   Unlucky received the statements.

80.   Unlucky not only did not object to the invoices or the amounts set forth in the invoices, but Unlucky made repeated promises to pay the invoices in full, with the sole exception of line items for Co-producers in the amount of $5,000 in invoice 111221 and $12,500 in invoice 120621.

81.   In fact, on multiple occasions, Unlucky falsely claimed that the amounts owed had already been electronically transferred to Red Hawk when no such transfers had been made.

82.     The total charged for services from September through December of 2021 equaled $187,275, and the undisputed amount which Unlucky promised to pay equaled $169,775.

83.     Red Hawk reasonably relied on Unlucky's promises and false statements and, as a result, continued to expend time and money working to produce the Picture.

84.     Notwithstanding Unlucky's many promises, the invoices were not paid in full resulting in damages to Red Hawk. Unlucky paid only $102,693.12, including one direct payment to Mr. Mehrad.

WHEREFORE, Red Hawk respectfully requests that this Honorable Court enter judgment in favor of Red Hawk and against Unlucky in the amount of $67,081.88, plus all pre and post-judgment interest, and costs and reasonable attorneys' fees incurred by Red Hawk.

Respectfully submitted,

HEILMAN LAW PLLC

Dated:  March 13, 2023

By:  /s/ Ryan D. Heilman
Ryan D. Heilman (P63952)
Attorney for Red Hawk Films, Inc.
40900 Woodward Ave., Suite 111
Bloomfield, MI 48304
(248) 835-4745
ryan@heilmanlaw.com

## EXHIBIT INDEX

| | |
|---|---|
| EXHIBIT A | Production Services Agreement (the "Contract") |
| EXHIBIT B | Invoice 100421 - October 4, 2021 |
| EXHIBIT C | Invoice 111221 - November 12, 2021 |
| EXHIBIT D | Invoice 120621 - December 6, 2021 |
| EXHIBIT E | Invoice 122821 - January 2022 |
| EXHIBIT F | February 2, 2022 Correspondence ("Default Notice") |

EXHIBIT A

<u>PRODUCTION SERVICES AGREEMENT</u>

THIS PRODUCTION SERVICES AGREEMENT ("Agreement") is dated as of September 1, 2021, and is between Unlucky Film, Inc. ("Company") and Red Hawk Films, Inc. ("Producer"), with respect to the documentary motion picture tentatively entitled "Unlucky" (the "Picture").

1.      <u>PRODUCTION</u>

(a) <u>Engagement</u>:  Company hereby engages Producer on an independent contractor basis to provide all production services and other elements requested by Company or otherwise necessary, desirable or appropriate for the production, completion and delivery to Company of the Picture, including without limitation, all necessary personnel, services, facilities, equipment and material, except for those items which Company notifies Producer that Company will handle itself.  Producer hereby accepts such engagement upon the terms and conditions set forth herein.  Producer agrees that all contracts and agreements with persons or entities rendering services, furnishing facilities, equipment or other material or granting rights in connection with such production, completion and delivery shall be entered into in Producer's name unless Company specifies otherwise, and shall contain terms and conditions customary in the motion picture industry for the applicable type of services, material or rights being rendered, furnished or granted and shall be fully assignable to Company.  Producer shall obtain from all interviewees and performers a signed consent in the form submitted to Producer by Company.  All rights and benefits flowing to Producer under each such agreement shall be deemed, and hereby are, assigned to Company concurrently with the effectiveness of such agreement.  All the above-the-line and key below-the-line agreements shall be subject to prior approval by Company.  Any product placement and/or barter agreements shall be subject to prior approval by Company.  It is further agreed that Producer shall fully and completely satisfy and discharge all obligations and liabilities undertaken by Producer in connection with each such contract and agreement.

(b) <u>Production Consultations and Approvals</u>:  All of Producer's services and activities hereunder shall be subject to the supervision, direction and control of Company.  Without limiting the generality of the preceding sentence, Producer shall consult with Company throughout the production of the Picture and shall obtain Company's prior approval for all artistic, creative, technical, financial and business elements and decisions in connection with the production of the Picture and the rendition of Producer's services hereunder.  Without limiting the generality of the foregoing, Producer shall submit for Company's approval, on or before such reasonable dates as Company shall hereafter designate, the following elements of the Picture (the "Elements"), including any substitutes therefor or material changes therein:

(i)      all interviewees, consultants and any performers;

(ii)      all final above-the-line and below-the-line elements of the Picture, including without limitation the executive producer, director, line producer, associate producer, director of photography, editor, art director, music coordinator, composer and unit production manager (Company hereby preapproves Scott Rosenbaum as director/producer and Tony Grazia as producer);

(iii)      the compensation and other terms of engagement of the personnel referred to in (i) and (ii) above.  In this regard, Producer shall not enter into any agreement relating to the Picture which provides for any participations in net profits of the Picture or any other form of contingent compensation;

(iv)     a final production and delivery schedule (upon final approval thereof by Company, the "Schedule"), specifying the number of shooting days, the locations, the delivery dates for rough cuts and final cuts, the dates designated by Company for the final delivery of the "Delivery Items" (as such term is defined in Subparagraph (c) below) the ("Delivery Dates"); provided it is hereby acknowledged that by the nature of documentary filmmaking, photography will be done in segments, depending on the timing of events and the availability of interviewees, with separate production and delivery schedules for segments, each subject to Company's prior approval;

(v)     a final detailed above-the-line and below-the-line production budget (including fees payable to Producer) (such production budget in the final form approved by Company shall hereinafter be referred to as the "Budget"); provided it is hereby acknowledged that by the nature of documentary filmmaking, photography will be done in segments, depending on the timing of events and the availability of interviewees, with separate production budgets for segments, each subject to Company's prior approval;

(vi)     the title and proposed running time of the Picture;

(vii)     evidence satisfactory to Company that Producer has obtained all rights and licenses (except as otherwise owned or controlled by Company) necessary for Producer to produce the Picture and assign the rights assigned to Company hereunder in accordance with all of the terms of this Agreement; and

(viii)     the pre-script outline(s) and the final post-shoot script of the Picture.

In the event that Company disapproves any one or more of the Elements set forth in Subparagraph 1(b) above, Producer shall find a substitute Element acceptable to Company.

(c) <u>Delivery</u>:  Producer shall produce the Picture in accordance with the Budget and the Schedule and all the provisions of this Agreement and shall deliver the Picture on or before the Delivery Dates.  Without limiting the generality of the foregoing, Producer shall timely deliver all of the items, materials and elements required to be delivered by Company pursuant to any agreement between Company and its distributors and all of the items, materials and elements which could reasonably be deemed necessary by Company to conform to any other foreign or domestic distribution agreement for distribution of the Picture in any media (all of the foregoing items, materials and elements are collectively referred to as the "Delivery Items").

(d) <u>Production Reports</u>:  Periodically during principal photography of the Picture, Producer shall furnish Company a written statement of (i) the amount required by Producer for production commitments during the succeeding period; (ii) all expenditures and commitments made during the preceding period; (iii) a cumulative statement of all expenditures and commitments made in respect of the Picture up to the last day of each such period and (iv) an estimate of the amount required to complete each budget item.  Such statements shall be furnished on a monthly basis, or as required by Company taking into account the flow of production.  In addition, Producer shall (i) promptly notify Company of any occurrence which does or might delay or interfere with the production of the Picture; (ii) keep and maintain accurate books and records with respect to the Picture; and (iii) furnish to Company copies of all vouchers, receipts and other documents relating to all receipts, expenses and charges incurred and items

2

received by Producer in connection with the production of the Picture, which books and records shall be available at all times during regular business hours to Company and its representatives or designees for audit and informational proposes.

      (e) <u>Requests for Changes</u>:  Producer shall make (at its sole expense) all changes to the Picture and the material contained therein as are timely and reasonably requested by Company; provided that in the event Company requests changes in material previously approved by Company and Producer has otherwise complied with all of the provisions of this Agreement, such changes shall be made by Producer at Company's expense.

      2.    <u>OWNERSHIP AND COPYRIGHT</u>

      (a) Producer shall produce the Picture and all constituent elements thereof as works made-for-hire specially ordered or commissioned by Company with Company being deemed the sole author of all such results and proceeds.  Company shall be the sole and exclusive owner of, and Producer hereby grants, assigns and transfers to Company, all rights in and to the Picture, and all copyrights therein, including, without limitation, all of Producer's right, title and interest in music included in the Picture, and all underlying works, including without limitation, the scripts, and all the results and proceeds of Producer's and all other persons' services engaged in connection with the Picture and, without limiting the generality of the foregoing, Company shall have the sole and exclusive right to distribute, use, transmit, display, exhibit, exploit, project, license, simulcast, advertise, promote, publicize, perform and otherwise turn to account (hereinafter collectively "Distribution" and/or "Distribute" as applicable) the Picture (in whole or in part) in any and all forms, manner and media, whether now known or hereafter devised, in perpetuity and throughout the universe in all languages in such a manner and to the extent, if at all, as Company in its sole and unfettered discretion shall determine.  If any of such results and proceeds are not deemed a "work-made-for-hire," Producer hereby presently assigns all such rights to Company. Producer hereby grants to Company all "rental" and "lending" rights and confirms that the compensation payable hereunder includes equitable remuneration for such rights. Producer expressly waives the benefits of any so-called "droit moral" or any similar law or provision.  All of Company's rights under this Agreement shall vest in Company immediately and shall remain perpetually vested in Company, its successors and assigns, whether this Agreement expires in its normal course or is terminated in whole or in part for any reason whatsoever.

      (b) Nothing in this Agreement shall require Company to distribute or cause or seek to cause any distribution of the Picture, and Company shall have discharged fully its obligations hereunder by paying to Producer the sums herein provided in accordance with the terms hereof.  Company may distribute or cause the distribution of the Picture upon such terms and conditions as Company may determine in its sole and absolute discretion, and without obtaining any approvals or consents from Producer or any other person.

      (c) Producer has, and shall have, no right, title, or interest of any nature whatsoever in the Picture, any underlying literary, dramatic or musical materials contained in or upon which the Picture is or may be based (including, without limitation, the script), any future productions or other derivative works based on or derived from the Picture or any of said underlying materials, or any element or aspect of any of the foregoing.  Concurrently with the execution hereof, Producer shall execute and deliver to Company a memorandum of exclusive rights in the form attached hereto and hereby incorporated herein.

3.    <u>PRODUCTION FINANCING AND COMPENSATION</u>

Subject to such deductions and withholdings as are required pursuant to any applicable law or regulation and on the conditions that Producer is not in material breach or default hereof and fully performs all of its obligations hereunder, Company hereby agrees as follows:

(a) <u>Production Advances</u>:  To advance to Producer for production of the Picture in accordance with the Budget, production advances (the "Production Advances").  The Production Advances shall be payable pursuant to a schedule to be determined by Company in good faith taking into consideration Producer's cash flow requirements under the Budget.

(b) <u>Producer Fee</u>:  To pay to Producer the amount referenced in the Budget as Producer's producer fee in accordance with the approved cash flow schedule.

4.    <u>EXPENSES, UNION PAYMENTS AND PROFIT PARTICIPATIONS</u>

(a) <u>Expenses</u>:  Producer shall pay all costs and expenses in connection with the production of the Picture and the delivery of the Delivery Items, including, without limitation, all fees, compensation and expenses due in connection with the services of all above-the-line and below-the line personnel engaged or employed in connection with the Picture, and obtaining all underlying rights, licenses, clearances or permissions, including licenses for music synchronization, music performance and literary, comedic, dramatic and other material (except as otherwise owned or controlled by Company).

(b) <u>No Guild Agreements</u>:  Neither the Picture nor Company shall be subject to any guild or union, unless Company agrees in writing in advance.

(c) <u>No Profit Participations</u>:  No profit participations of any kind shall be payable to Producer or any person or entity engaged by Producer, unless Company agrees in writing in advance.

5.    <u>INSURANCE</u>

Company agrees to obtain and maintain those insurance policies which are customarily maintained by producers of motion pictures in the United States, including a package of general comprehensive liability insurance, E&O insurance, third party property damage insurance and workers' compensation insurance, and shall have Producer, Scott Rosenbaum and Tony Grazia covered as additional insureds.  Producer agrees to assist Company in obtaining such insurance policies.

6.    <u>PRODUCER'S WARRANTIES, REPRESENTATIONS AND COVENANTS</u>

Producer hereby warrants, represents and covenants to Company as follows:

(a)  Producer is a duly organized and existing corporation and is presently in good standing under the laws of the state of its incorporation.

(b)  The consent of no other person or entity is necessary for Producer to enter into and fully perform this Agreement and Producer has not done and will not do any act and has not made and will not make any grant, assignment or agreement which will or might conflict or interfere with the complete enjoyment of all of Company's rights hereunder.

(c)  Producer has entered into or will enter into valid and binding written employment agreements with all persons rendering services in connection with the Picture.  Any and all services rendered by said persons shall be furnished and rendered as employees-for-hire of Producer who, as said persons' employer, shall have and fulfill all responsibilities of an employer, including without limitation those arising under any workers' compensation laws and other legal requirement or any applicable Guild Agreement; and the results and proceeds of all said persons' services shall be "works-made-for-hire" and shall be properly treated and designated as such in said persons' employment agreements with Producer.  Except as expressly set forth to the contrary in this Agreement, Producer hereby agrees to make or cause to be made when due all payments of compensation which may be required to be remitted to persons or entities rendering services or furnishing equipment, facilities, rights or other material to Producer in connection with the Picture and to make such deductions and withholdings from and payment on account of such compensation (including without limitation all payments of taxes and other contributions which have arisen or may arise out of the services to be rendered or the equipment, facilities, rights or other material to be furnished by any of said persons and entities in connection with the Picture) as are required or permitted to be deducted and withheld from or paid on account of compensation paid to said persons and entities under the provisions of applicable laws or regulations or Guild Agreements.

(d)  No agreements entered into by Producer in connection with the Picture shall provide for the payment of any residuals, royalties or other payments with respect to the distribution, broadcast, exhibition or any other exploitation of the Picture in excess of the applicable minimum scale, if any, required to be paid by the terms of the applicable union agreement for such distribution, broadcast, exhibition or other exploitation; provided it is acknowledged and agreed that the Picture shall not be subject to any union without Company's prior written consent.

(e)  The Picture shall be of at least the same quality and have at least the same production standards as comparably budgeted and scheduled documentary motion pictures being produced in the Los Angeles, California area.

(f)  Neither the Picture, nor any constituent element thereof (including without limitation the title) (but excluding any material owned or controlled by Company and provided to Producer for use in the Picture) nor the exercise by Company, or any party authorized by Company, of any rights granted to or agreed to be granted to or vested in Company hereunder, shall violate the right of privacy or publicity of, any so-called "moral rights" of, defame, or infringe any copyright, trademark, service mark, common law or other right of any person, firm or corporation, or violate any other applicable law or regulation or the terms of any agreement that Producer has or will enter into.

(g)  The Delivery Items shall be delivered by Producer to Company on or before the Delivery Dates and shall be of a commercially acceptable technical quality.

(h)  Producer has the right to enter into this Agreement, to grant the rights herein granted and to perform fully all of its obligations and agreements hereunder; Producer will acquire all rights necessary to vest in and grant to Company all rights vested in and granted or agreed to be granted to Company hereunder (and will at Company's request deliver to Company copies of all such documents as evidence of Producer's acquisition of such rights) including, without limitation, all copyrights, music performance rights, music synchronization rights, still photo, film or videotape footage licenses or other appropriate license of all elements of the Picture (other than those Elements owned or controlled by Company), or such constituent

5

elements as are owned by Producer, or are in the public domain.  Producer shall furnish to Company a music cue sheet with respect to any and all musical compositions contained in the Picture, which cue sheet shall list the titles of such compositions and the writers and publishers thereof.  With respect to each composition used in the Picture, the Performing Rights necessary for exhibition of the Picture are:  (i) controlled by American Society of Composers, Authors and Publishers ASCAP or SESAC, (ii) in the public domain or (iii) owned by or licensed to Producer. Company may replace any composition in the Picture if during the term of the copyright a Performing Rights license from any such performing rights society for such composition cannot be obtained or maintained as may be necessary for Company's distribution of the Picture hereunder.

(i)  This Agreement is not and will not be subject to any claim against Company for fees or commissions by any agent or representative of Producer or any other person or entity.

(j)  Producer shall not violate any Guild Agreement or governmental rule, regulation, law, statute or ordinance in connection with the development, production or delivery of the Picture hereunder.

7.     COMPANY'S WARRANTIES, REPRESENTATIONS AND COVENANTS

Company hereby warrants, represents and covenants to Producer as follows:

(a)  Company is a duly organized and existing corporation and is presently in good standing under the laws of the state of its incorporation.

(b)  The consent of no other person or entity is necessary for Company to enter into and fully perform this Agreement.

8.     CONFIDENTIALITY

Producer acknowledges that the subject matter of the Picture is of a confidential nature. Producer shall not issue, or authorize or permit the issuance of, any publicity or grant any interview or make any statements relating to Company, the Picture or Producer's services under this Agreement unless the same are first approved in writing by Company.  "Confidential Information" means such information (irrespective of the form and/or timing of communication) as is deemed by Company to be proprietary and is disclosed to Producer or Producer's Representatives (as defined below), or becomes known to Producer or Producer's Representatives, as a consequence of or through Producer's past, present, or future relationship or engagement with Company, including, without limitation, any information prepared by Producer or Producer's Representatives that contains (or is based on), in whole or in part, any such information, and specifically including, without limitation, interviews, research, facts, documents, writings, notes and other information and materials related to the subject matter of the Picture. "Producer's Representatives" means all of Producer's directors, officers, employees, subcontractors, representatives, agents, and those engaged by Producer in connection with the Picture.  Except as required in connection with the performance of Producer's obligations under this Agreement, Producer will not (and Producer will cause the Producer's Representatives not to), either during or after the term of this Agreement, use, publish, disseminate, distribute or otherwise disclose any Confidential Information without Company's prior written consent.  Producer will (and Producer will cause the Producer's Representatives to) take all steps necessary and/or reasonably requested by Company to ensure that all such Confidential Information is kept confidential and is held in trust in a fiduciary capacity for the sole use and benefit of Company. The provisions of this section will survive the expiration or earlier

6

termination of this Agreement. Producer has executed, or will execute concurrently with the execution of this Agreement, Company's standard Non-Disclosure Agreement, which is hereby incorporated herein.

9.  CREDIT, ADVERTISING AND PROMOTION

(a) The Picture shall contain the credits set forth in Exhibit ___ attached hereto. The Picture shall contain no commercial or promotional credits not approved in writing by Company. The closing credits shall not include any logos, graphics, photographs, addresses, telephone numbers or voiceover mentions unless the same have been approved in writing by Company. No casual or inadvertent failure by Company to comply with the credit provisions hereof (by reason of shortage of time or otherwise), nor any failure by any third party to comply with such credit provisions, shall constitute a breach by Company of this Agreement.

(b) Producer shall not agree to accord any credits in connection with the Picture without Company's prior written consent. Producer shall deliver to Company, prior to delivery of the Picture, a complete statement (the "Producer's Statement") setting forth the credits to be accorded to all persons and entities in connection with the Picture. Company shall be entitled to rely entirely upon the Producer's Statement, and Producer shall defend, indemnify and hold Company harmless (at Producer's own expense) against any claim, action or proceeding (or any costs, fees or expenses incurred in connection therewith) alleging any improper or insufficient credit accorded to any person, firm or corporation.

(c) Throughout the term of copyright in the Picture and without limiting the generality of Section 2, above, Company shall have the right and may grant others the right:

(i) to use Producer's name and the name of any person rendering services or furnishing any material in connection with the Picture or appearing in any of the Picture, as well as Producer's and such person's biography, photograph, likeness and recorded voice for information purposes and to advertise, promote and publicize the Picture and Company, but not as an endorsement of any product or other service;

(ii) to use for information purposes and to advertise, promote, package and publicize the Picture and Company, photographs taken of and during the production of the Picture; and

(iii) to produce, own and exploit by all means, uses or media a motion picture and/or television Picture concerning the production of the Picture subject to payment by Company of sums required solely by reason of such further exploitation pursuant to any union agreements or pursuant to third party agreements assigned to and assumed by Company in writing.

(d) Prior to the Delivery Date, Producer shall make available to Company portions of the Picture selected by Company in its sole discretion from the rough cut for Company's use in preparing on-air promotional spots and/or a trailer or trailers in connection with the promotion of the Picture and/or Company. At Company's request, Producer shall assist Company in the preparation of such promotional spots and trailers.

(e) Except as otherwise expressly provided to the contrary herein, Producer shall obtain all rights, releases and licenses necessary for Company's exercise of any of Company's rights pursuant to this-paragraph, and Producer shall defend, indemnify and hold Company harmless (at Producer's own expense) against any claim, action or proceeding (or any costs, fees

7

or expenses, whether or not incurred in the course of litigation and whether or not incurred by Company in enforcing this Agreement against Producer) arising out of or in connection with any exercise by Company of such rights.

(f)  Producer shall not publish or cause the publication of any announcement, advertisement, promotional or publicity statement or other statement in connection with the Picture or the production or exploitation thereof.

10.    INDEMNIFICATION

Producer agrees to indemnify, defend and hold Company, its members, managers, officers, employees, partners, successors, licensees, agents, attorneys and assigns harmless from and against any and all judgments, liabilities, claims, damages, costs and expenses (including reasonable attorneys' fees) in connection with or resulting from any breach or alleged breach of any representation, warranty, or agreement made by Producer contained in this Agreement.

Company agrees to indemnify, defend and hold Producer, its members, managers, officers, employees, partners, successors, licensees, agents, attorneys and assigns harmless from and against any and all judgments, liabilities, claims, damages, costs and expenses (including reasonable attorneys' fees) in connection with or arising out of the distribution or other exploitation of the Picture, provided that such indemnity will not apply to such judgments, liabilities, claims, damages, costs or expenses for which Company is entitled to indemnification from Producer hereunder.

11.    EARLY TERMINATION; NONCONFORMING DELIVERY

(a)  If Producer shall be prevented or delayed in the production or delivery of the Picture because of any accident, riot, strike, epidemic or act of God, or any similar condition beyond Producer's control (an event of "*force majeure*") the delivery requirements of this Agreement (including the Delivery Date) shall be suspended during the period of such event of *force majeure*.  If such event or events of *force majeure* continue for an aggregate period of sixty (60) days or longer, Company may elect, at its sole option, in addition to its other rights and remedies in law, in equity and otherwise, the terms set forth in subparagraph (d) below of this Paragraph.

(b)  If Producer shall be in material breach or material default (including, without limitation, anticipatory breach) of this Agreement, which breach or default relates to Producer's ability to produce and deliver the Picture in timely fashion and according to all of the other terms of this Agreement (including, without limitation, material nonconformity according to the terms of this Agreement), and such breach or default shall not have been corrected within thirty (30) days after notice by Company to Producer thereof, Company may elect, at its sole option, in addition to its other rights and remedies in law, equity and otherwise, the terms of subparagraph (d) below of this Paragraph.

(c)  If Producer is enjoined or restrained by court order from conducting all or any part of its business affairs relating to the production of the Picture and Producer's ability to produce the Picture thereby is materially impaired; or if all or a substantial part of Producer's property is attached, seized, levied upon, or comes under the possession of a receiver, trustee or assignee for the benefit of creditors, and such attachment, seizure or levy, etc. is not promptly lifted; or if any proceeding is filed by or against Producer for bankruptcy, dissolution or liquidation; or if Producer is insolvent or unable to pay its debts as they mature, then Company

8

may elect, at its sole option, in addition to its other rights and remedies in law, equity or otherwise, the terms set forth in subparagraph (d) below of this Paragraph.

(d) Pursuant to the terms of subparagraphs (a), (b) or (c) of this Paragraph, Company may elect the following:

(i) Producer shall promptly repay to Company any and all amounts paid or reimbursed to Producer pursuant to this Agreement which have not been expended by Producer prior to the date of Company's election. Producer shall account to Company in writing within twenty-five (25) days of Company's election for any amounts expended.

(ii) Producer shall promptly deliver all elements of the Picture (whenever produced and in whatever stage of production) produced or in production prior to Company's election and all appropriate licenses, agreements or rights in such elements to Company, and Company shall have the right, but not the obligation, to complete production of the Picture. In this regard, immediately following Company's election, Producer shall assign to Company, at Company's option, any and all such agreements relating to the Picture (including, without limitation, any agreements with persons or entities rendering or furnishing services in connection with the Picture).

(iii) All rights of Producer, including, without limitation, the right to produce the Picture pursuant to Paragraph 1, above, under this Agreement other than as set forth in this subparagraph (d) shall be terminated.

(e) Either party may terminate this Agreement by giving the other party fifteen (15) days prior written notice, and the terms of subparagraph (d) of this Paragraph shall apply. In such event, both parties will work together in good faith during said 15-day period, as well as after said 15-day period (if necessary or desirable), to assure a smooth transition. Notwithstanding anything in this Agreement to the contrary, any termination of this Agreement (however occasioned) shall not affect the coming into force or the continuance in force of any provision hereof which is expressly or by implication intended to come into or continue in force on or after such termination. In particular, the provisions of the following paragraphs shall survive the termination of this Agreement: Ownership and Copyright; Insurance; Warranties, Representations and Covenants; Confidentiality; Credit, Advertising and Promotion; Indemnification; and 13(a) Waiver of Equitable Relief. Notwithstanding anything in this Agreement to the contrary, Producer, Scott Rosenbaum and Tony Grazia shall have the right to elect to have their names and credits removed from the Picture and all related materials and listings, whether or not this Agreement is terminated early.

12. NOTICES

All notices, statements or other documents which either party is required or desires to give to the other party must be in writing and be sent to the other party at the address indicated below, and must be either personally delivered or sent through the United States mail registered or certified mail, or by facsimile or email (with a confirmation copy sent by mail), or by Federal Express or other comparable overnight courier service. The parties' addresses are:

<u>PRODUCER</u>
Red Hawk Films, Inc.
116 Bacon Road
Old Westbury, NY 11568
Attn: Scott Rosenbaum
scott@redhawkfilms.com

<u>COMPANY</u>
Unlucky Film, Inc.
1098 Ann Arbor Rd. W
Suite 330
Plymouth, MI 48170
Attn: Timothy Mucciante
mucciante@medicimedia.org

<u>WITH A COPY TO</u>
Law Offices of Kim H. Swartz
Attn: Kim H. Swartz, Esq.
Via email:  khs@KimHSwartz.com

Notice shall be deemed given when sent pursuant to this paragraph.  All payments made to Producer hereunder shall be sent to Producer at the notice address stated above.

13.   <u>MISCELLANEOUS</u>

(a)  Rights granted or agreed to be granted to Company hereunder shall be irrevocably vested in Company, and Producer's sole remedy, in the event of a breach hereof by Company, shall be the right to seek money damages incurred as a result of such breach.  In no event shall Producer have the right to injunctive or other equitable relief or to terminate or rescind this Agreement or the rights herein granted or to in any way enjoin or restrain the production, distribution, advertising or other exploitation of the Picture.

(b)  Producer agrees that Company and its assignees shall have the right to assign this Agreement, in whole or in part, or any of Company's rights or obligations hereunder, at any time to any party.  Producer shall not have the right to assign this Agreement.

(c)  At Company's request, Producer shall promptly execute or cause the execution of all additional documents, and perform or cause the performance of any other acts, which Company may reasonably deem necessary or desirable to effectuate the purposes of this Agreement, including executing concurrently with the execution of this Agreement the attached Memorandum of Exclusive Rights.  Upon Producer's failure to do so promptly, Producer appoints Company as its attorney-in-fact for such purposes (it being acknowledged that such appointment is irrevocable and shall be deemed a power coupled with an interest), with full power to execute and deliver such documents and with full powers of substitution and delegation.

(d)  This Agreement contains the full and complete understanding between Producer and Company with reference to the within subject matter, supersedes all prior agreements and understandings whether written or oral pertaining thereto, and cannot be modified except by a written instrument signed on behalf of both Producer and Company.  This Agreement may be executed in counterparts and may be executed and delivered electronically.

(e)  This Agreement shall be governed by and construed in accordance with the laws of the State of California applicable to agreements executed and to be wholly performed therein, without giving effect to any principles regarding choice of laws.  Except as it relates to injunctive relief, any controversy or claim arising out of or in relation to this Agreement or the

validity, construction or performance of this Agreement, or the breach thereof, shall be resolved by arbitration before and in accordance with the rules of the American Arbitration Association under its jurisdiction in Wayne County, Michigan before a single arbitrator familiar with entertainment law.  The parties shall have the right to engage in pre-hearing discovery in connection with such arbitration proceedings.  The parties agree that they will abide by and perform any award rendered in any arbitration conducted pursuant hereto, that any court having jurisdiction thereof may issue a judgment based upon such award and that the prevailing party in such arbitration and/or confirmation proceeding shall be entitled to recover its reasonable outside attorneys' fees and expenses. The arbitration will be held in Wayne County, Michigan and any award shall be final, binding and non-appealable.  The parties agree to accept service of process in accordance with the AAA rules.  Any actions arising from this Agreement relating to injunctive relief shall be commenced and prosecuted only in the courts of the State of Michigan, in Wayne County, or the federal courts within Wayne County, which courts shall have exclusive jurisdiction thereof.  Each party agrees not to contest the personal jurisdiction of these courts and the prevailing party in such actions shall be entitled to recover from the non-prevailing party the cost of reasonable outside attorneys' fees and expenses incurred.

(f)  In the event that there is a conflict between any provision of this Agreement and any statute, law, regulation, or any applicable and binding collective bargaining agreement, the latter shall prevail; provided, however, that in such event, the provision of this Agreement so affected shall be curtailed and limited only to the minimum extent necessary to permit compliance with the minimum requirement; no other provisions of this Agreement shall be affected thereby and all such other provisions shall continue in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first hereinabove written.

UNLUCKY FILM, INC.
(Company)

By: _____
Its: __**President**_____

RED HAWK FILMS, INC.
(Producer)

By: *scott rosenbaum*
Its: __Manager_____

11

EXHIBIT B



**Red Hawk Films**
**116 BACON ROAD**
**OLD WESTBURY NY 11568**
**Fed ID: 20-2630284**
**PH: 516.459.1846**
**scott@redhawkfilms.com**

**INVOICE**

Invoice:100421

October 4, 2021

TO: Mr. Timothy Mucciante
President – Medicci Media
2055 Walton Rd
St. Louis, MO 63114

For: Production Services related to the filming of the documentary feature film titled, *Unlucky*.

Rate for services: $20,290.00 (see Attached Budget)

Expenses:

AMOUNT DUE: $20,290.00

Please make check payable to: Red Hawk Films, Inc.
Venmo - @Scott-Rosenbaum-9
Wire instructions: Red Hawk Films, Inc. – Acct. 720938759 – ABA 201000021

EXHIBIT C



**Red Hawk Films**
**116 BACON ROAD**
**OLD WESTBURY NY 11568**
**Fed ID: 20-2630284**
**PH: 516.459.1846**
**scott@redhawkfilms.com**

**INVOICE**

Invoice:111221

November 12, 2021

TO: Unlucky Film, Inc.
Att: Mr. Timothy Mucciante
President
1098 Ann Arbor Road
Suite 330, Plymouth, MI 48170

For: Advance against budget for October - November 2021

| | |
|---|---|
| DIRECTOR | $25,000 |
| PRODUCER | $17,500 |
| COPRODUCERS | $ 5,000 |
| SHOOT (ESTIMATE WEEK NOVEMBER 14TH) | $15,000 |
| EDITOR (4 WEEKS $3,200 PER WEEK) | $12,800 |
| REDHAWK FEE | $18,750 |

Expenses:

AMOUNT DUE: $94,050

Please make check payable to: Red Hawk Films, Inc.
Venmo - @Scott-Rosenbaum-9
Wire instructions: Red Hawk Films, Inc. – Acct. 720938759 – ABA 201000021

EXHIBIT D



**Red Hawk Films**
**116 BACON ROAD**
**OLD WESTBURY NY 11568**
**Fed ID: 20-2630284**
**PH: 516.459.1846**
**scott@redhawkfilms.com**

**INVOICE**

Invoice:120621

December 6, 2021

TO: Unlucky Film, Inc.
Att: Mr. Timothy Mucciante
President
1098 Ann Arbor Road
Suite 330, Plymouth, MI 48170

For: Advance against budget for December 2021

| | |
|---|---|
| DIRECTOR | $12,500 |
| PRODUCER | $8,750 |
| COPRODUCERS | $12,500 |
| SHOOT (ESTIMATE December) | $10,000 |
| EDITOR (4 WEEKS $3,200 PER WEEK) | $12,800 |
| REDHAWK FEE | $9,375 |
| PRODUCTION ACCOUNTANT | $2,000 |
| ARCHIVAL RESEARCH | $5,000 |

AMOUNT DUE: $72,935.00

Wire instructions: Red Hawk Films, Inc. – Acct. 779202305 – ABA 021000021

EXHIBIT E



**Red Hawk Films**
**116 BACON ROAD**
**OLD WESTBURY NY 11568**
**Fed ID: 20-2630284**
**PH: 516.459.1846**
**scott@redhawkfilms.com**

**INVOICE**

Invoice:120621

December 6, 2021

TO: Unlucky Film, Inc.
Att: Mr. Timothy Mucciante
President
1098 Ann Arbor Road
Suite 330, Plymouth, MI 48170

For: Advance against budget for December 2021

| | |
|---|---|
| DIRECTOR | $12,500 |
| PRODUCER | $8,750 |
| COPRODUCERS | $12,500 |
| SHOOT (ESTIMATE December) | $10,000 |
| EDITOR (4 WEEKS $3,200 PER WEEK) | $12,800 |
| REDHAWK FEE | $9,375 |
| PRODUCTION ACCOUNTANT | $2,000 |
| ARCHIVAL RESEARCH | $5,000 |

AMOUNT DUE: $72,935.00

Wire instructions: Red Hawk Films, Inc. – Acct. 779202305 – ABA 021000021

EXHIBIT F

RED HAWK FILMS
116 BACON ROAD
OLD WESTBURY, NY 11568

February 2, 2022

Via email mucciante@medicimedia.org and US Mail
Unlucky Film, Inc.
1098 Ann Arbor Rd. W
Suite 330
Plymouth, MI 48170
Attn: Timothy Mucciante

Via email only: khs@KimHSwartz.com
Law Offices of Kim H. Swartz
Attn: Kim H. Swartz, Esq.

      RE:    Notice of Breach of Production Services Agreement dated September 1, 2021

Dear Mr. Mucciante:

Reference is made to a certain agreement titled "Production Services Agreement" dated September 1, 2021 between Unlucky Film, Inc. ("Unlucky") and Red Hawk Films, Inc. ("Red Hawk") (the "Agreement").  Please be advised that this letter is a formal notice of material breach by Unlucky of the terms of that Agreement.

As you are undoubtedly aware, Unlucky has failed to make payments in accordance with the Agreement and its acknowledged obligations.  More specifically, as of this writing, the sum of $97,435.00, which has been accounted for in its entirety by Red Hawk, remains unpaid and owing of which $24,050 has been due since October 2021.  Despite our repeated demands and assurance from both you and your counsel that all of the arrearages would be paid, Red Hawk remains unacceptably unpaid.  We therefore demand that Unlucky immediately remit all of the promised arrearages immediately.

Unless payment is received in full no later than February 11, 2022, we will consider the contract terminated by your breach and explore all of our legal rights including but not limited to legal proceedings necessary to recover the outstanding amount and damages without further notice.  This letter is sent with a full reservation of all of our rights and remedies afforded under the law.  Please guide yourself accordingly.

Very truly yours,

Scott Rosenbaum