UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **UNLUCKY FILM INC.,** | **2:24-CV-10149-TGB-EAS** |
| Plaintiff, | HON. TERRENCE G. BERG |
| vs. | |
| **RED HAWK FILMS, INC.,** | |
| Defendant. | |

**RED HAWK FILMS, INC.'S COMBINED MOTION
FOR PARTIAL RELIEF FROM PRELIMINARY
INJUNCTION AND ENTRY OF ORDER
<u>PERMITTING SALE OF FILM AND BRIEF IN SUPPORT</u>**

## <u>QUESTION PRESENTED</u>

1. Should this Court modify or terminate a stipulated preliminary injunction (ECF No. 17) and permit Red Hawk Films, Inc. to sell certain film due to the following changed circumstances: (i) an unexpected offer to purchase the film was recently received with an August 31, 2024 deadline, (ii) Red Hawk has obtained reliable information that the film will lose essentially all value if not sold by early autumn, (iii) Plaintiff is unable or unwilling to retain its third set of counsel or sign a completed and fully-negotiated settlement agreement, and (iv) Plaintiff's owner is subject to a writ of garnishment issued last month in excess of $600,000?

   Red Hawk Films, Inc. submits that the Court should modify or terminate the preliminary injunction.

## <u>Controlling or Most Appropriate Authority</u>

*LFP IP, LLC v. Hustler Cincinnati, Inc.*,
        810 F.3d 424, 426 (6th Cir. 2016)

*Gooch v. Life Invs. Ins. Co. of Am.*,
        672 F.3d 402, 414 (6th Cir. 2012)

*Leary v. Daeschner*,
        228 F.3d 729, 736 (6th Cir. 2000)

*Univ. of Texas v. Camenisch*,
        451 U.S. 390, 395, 101 S. Ct. 1830 (1981)

  *Michaels v Amway Corp*,
        206 Mich App 644, 650; 522 NW2d 703 (1994)

  *Salita Promotions Corp. v. Ergashev*,
        500 F. Supp. 3d 648, 654-655 (E.D. Mich. 2020)

# TABLE OF CONTENTS

**Motion** ............................................................................. 1

II.    Factual Background ...................................................... 1

A. The Course of Litigation ............................................1

B. Sporadic Settlement Discussions and the Settlement
   Agreement ............................................................... 4

C. The Offer ................................................................ 6

II.    Request for Relief ......................................................... 8

III.   Basis for Relief  .............................................................. 8

IV.    Notice and Request for Concurrence  .............................11

V.     Conclusion  ...................................................................11


**Brief** ...........................................................................13

I.     Introduction  ................................................................. 8

II.    The Preliminary Injunction is a Preliminary Order
       that May be Revisited by the Court in Light of Changed
       Circumstances.  ...........................................................14

III.   The Preliminary Injunction Should be Lifted or
       Modified to Permit the Sale of the Film to Mr.
       Broadwater ...................................................…...…..15

A. Preliminary Injunction Standard ................................ 15

B. Unlucky has No Likelihood of Success on the Merits ......16

C. Unlucky Would Suffer No Irreparable Harm ................19

D. Lifting of the Preliminary Injunction Would Be In
   The Public Interest ...................................................22

IV.   Conclusion .................................................................. 23

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*LFP IP, LLC v. Hustler Cincinnati, Inc.*,
  810 F.3d 424, 426 (6th Cir. 2016) …………………………..……8, 14

*Sys. Fed'n No. 91, Ry. Employes' Dep't v. Wright*,
  364 U.S. 642, 647, 81 S. Ct. 368 (1961) ………………………….9

*United States v. United Shoe Machinery Corp.*,
  391 U.S. 244, 248-49, 252, 88 S. Ct. 1496 (1968) …………………...9

*Gooch v. Life Invs. Ins. Co. of Am.*,
  672 F.3d 402, 414 (6th Cir. 2012) …………………………………9, 14

*Leary v. Daeschner*,
  228 F.3d 729 (6th Cir. 2000) …………………………………….... 15

*Univ. of Texas v. Camenisch*,
  451 U.S. 390, 395, 101 S. Ct. 1830 (1981) ………………………. 15

*Gonzales v. National Bd. of Med. Examiners*,
  225 F.3d 620, 625 (6th Cir. 2000) ……………………………….... 16

*Chrysler Corp. v. Skyline Indus. Servs.*,
  448 Mich. 113, 124-128, 502 N.W.2d 715 (1993) ……………...16 fn3

*Oasis West Realty, LLC v. Goldman*,
  51 Cal.4th 811, 821, 250 P.3d 1115 (Cal. 2011) ……………………17

*Brown v. Grimes*,
  192 Cal.App.4th 265, 277-278 (Cal. App. 2011) …………………... 17

*Michaels v Amway Corp*,
  206 Mich App 644, 650; 522 NW2d 703 (1994) ……………………. 17

*Ergonomic Sys. Phil. Inc. v. CCS Int'l Ltd.*,
    777 N.Y.S.2d 446, 447, 7 A.D.3d 412, 413-414 (2015) ............. 17

*Nomura Asset Capital Corp. v. Cadwalader*,
    889 N.Y.S.2d 506 (2009) ..................................................... 17

*Overstreet v. Lexington-Fayette Urban Cty. Gov't*,
    305 F.3d 566, 578-79 (6th Cir. 2002) .................................... 20

*Salita Promotions Corp. v. Ergashev*,
    500 F. Supp. 3d 648, 654-655 (E.D. Mich. 2020) ................... 20

*Canon Inc. v. GCC Int'l Ltd.*,
    450 F. Supp. 2d 243, 256 (S.D.N.Y. 2006) ............................ 20

*Big Time Worldwide Concert & Sport*
    *Club at Town Ctr. v. Marriott Int'l*,
    236 F. Supp. 2d 791, 797 (E.D. Mich. 2003) ......................... 21

*Material Handling Sys. v. Cabrera*,
    572 F. Supp. 3d 375, 380 (W.D. Ky. 2021) ........................... 22

## **Other Authority**

11A Charles Alan Wright et al.,
Federal Practice & Procedure § 2961 (3d ed. 2015) ........................ 9

Restatement [Second] of Contracts § 237 ..................................... 17

11A Charles Alan Wright & Arthur R. Miller,
Federal Practice and Procedure § 2948.1 (3d ed. 2020) ...................20

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **UNLUCKY FILM INC.,** | **2:24-CV-10149-TGB-EAS** |
| Plaintiff, | HON. TERRENCE G. BERG |
| vs. | |
| **RED HAWK FILMS, INC.,** | |
| Defendant. | |

### RED HAWK FILMS, INC.'S MOTION FOR PARTIAL RELIEF FROM PRELIMINARY INJUNCTION AND ENTRY OF ORDER PERMITTING SALE OF FILM

Defendant and Counter-plaintiff Red Hawk Films, Inc. ("Red Hawk") states as follows for its Motion for Partial Relief from Preliminary Injunction and Entry of Order Permitting the Sale of Film ("Motion"):

### Factual Background – the Course of Litigation

1.      Unlucky Film, Inc. ("Unlucky") commenced this case against Red Hawk on January 19, 2024 by filing its complaint alleging counts for breach of contract, declaratory judgment and breach of fiduciary duty. ECF No. 1. Through the Complaint, Unlucky requests compensatory damages in an unspecified amount in excess of $75,000,

plus punitive damages and entry of preliminary and permanent injunctions. ECF No. 1 at 17-18.

2.     On the same day, Unlucky filed its Motion for Preliminary Injunction. ECF No. 3.

3.     On March 13, 2024, Red Hawk timely filed its Answer to the Complaint and Affirmative Defenses as well as a Counterclaim. ECF No. 10. Red Hawk's Counterclaim asserts counts for breach of contract, account stated, and promissory estoppel, and seeks damages of $190,206.88, plus an amount to be determined by the Court to compensate Red Hawk for reputational damages and lost opportunities. ECF No. 10 at 12-13 (lesser damages are requested for the account stated and promissory estoppel counts).

4.     Red Hawk timely filed its answer to the Motion for Preliminary Injunction on March 20, 2024. ECF No. 13.

5.     On March 28, 2024, Unlucky's initial counsel, Howard & Howard Attorneys PLLC, withdraw and Augustine O Igwe, P.C. substituted in as replacement counsel. ECF No. 15.

6.     On April 18, 2024, Augustine O Igwe, P.C. moved to withdraw as counsel, asserting a complete irreparable breakdown in the

attorney-client relationship and no payment of attorneys' fees. ECF No. 18.

7.     On April 30, 2024, this Court held a status conference by telephone. During that status conference, the Court and Red Hawk were informed that Rossman, P.C. intended to substitute in as counsel in place of Augustine O Igwe, P.C.

8.     During the status conference, Unlucky represented to the Court that there would be no further substitutions of counsel in this case.

9.     On May 1, 2024, Mark C. Rossman and Isra K. Khuja of the Rossman, P.C. firm filed appearances on behalf of Unlucky.

10.    On May 17, 2024, the parties stipulated to entry of an order resolving Unlucky's Motion for Preliminary Injunction (the "Stipulated Injunction Order," ECF No. 17). Under the terms of the Stipulated Injunction Order, Red Hawk agreed that it would not sell certain film relating to Anthony Broadwater and relating to the parties Production Services Agreement (the "Broadwater Film").

11.     On June13, 2024, the Court issued its Scheduling Order which, among other things, establishes October 14, 2024 as the last day for discovery. ECF No. 24.

12.     On July 15, 2024, Mark C. Rossman and Isra K. Khuja filed a motion to withdraw as counsel asserting an irreconcilable breakdown of the attorney-client relationship, and at least strongly implies that Unlucky failed to pay attorneys' fees. Id., p. 2.

13.     The Court has scheduled a hearing on Mark C. Rossman and Isra K. Khuja's motion to withdraw for August 13, 2024. ECF No. 26.

## Sporadic Settlement Discussions and Settlement Agreement

14.     In February 2024, shortly after Red Hawk became aware of this case,[1] counsel for Red Hawk reached out to Unlucky's original counsel to discuss potential settlement of this matter.

15.     Based on discussions with Unlucky's counsel, Red Hawk drafted a proposed term sheet and transmitted it to Unlucky's counsel on February 14, 2024. Red Hawk received a revised term sheet from Unlucky on March 1, 2024 and responded with additional comments on March 8, 2024.

---

[1] Scott Rosenbaum, the owner of Red Hawk, was in Australia when this case was filed and did not return from vacation until the first week of February.

4

16.    Unlucky refused to engage in any further substantive settlement discussions until the Rossman, P.C. firm was retained in May, 2024.

17.    On May 30, 2024, Unlucky accepted the last version of the term sheet with one additional comment. **Exhibit 2**. Under the terms of the Term Sheet, Red Hawk would deliver all Broadwater Film and related materials to Unlucky in exchange for payment of $120,000, broad mutual releases, and dismissal of this lawsuit with prejudice.

18.    Red Hawk promptly accepted the term sheet with the additional comment. However, the Term Sheet is not binding by its own terms, concluding: "This term sheet is not binding. If the terms are agreeable to each party, the parties intend to draft a definitive settlement agreement and mutual releases incorporating these terms."[2]

19.    Red Hawk drafted and circulated a comprehensive settlement and release agreement.

20.    Despite representations that Unlucky is looking to resolve this matter quickly, Unlucky has never responded to the comprehensive settlement agreement or provided any substantive comments.

---

[2] Absent this language, Red Hawk would now be filing a motion to enforce settlement agreement.

21.    Given that Unlucky's third set of attorneys is now withdrawing, Red Hawk reasonably believes that Unlucky's failure and refusal to complete settlement discussions is a result of Unlucky's inability to make the required payment.

22.    This belief is further supported by public filings involving Timothy Mucciante, Unlucky's owner and, upon information and belief, sole officer issued just last month. Writ of Continuing Garnishment issued by this Court on July 3, 2024 in Case No. 24-MC-50817 authorizing garnishment relating to an outstanding balance of $678,249.90, attached as **Exhibit 3**. See also **Exhibit 4**, Macomb County Docket Sheets showing Mr. Mucciante's inability to pay a criminal restitution judgment.

23.    Likely due to Unlucky's inability to make the payment promised in the Term Sheet, settlement discussions have fallen apart in this case.

## The Offer

24.    On July 25, 2024, Red Hawk received an offer made on behalf of Anthony Broadwater to purchase the Broadwater Film for the amount of $130,000 (the "Broadwater Offer"). The Broadwater Offer

6

requires that Red Hawk be able to provide the Broadwater Film to Mr. Broadwater by the end of August. **Exhibit 5**.

25.    Red Hawk is informed that the Broadwater Film must be made available by or near the end of August of this year or the Broadwater Film will become essentially worthless.

26.    This is because Alex Gibney is in the process of producing a documentary on Mr. Broadwater and his wrongful conviction and 17-year long incarceration for the 1981 sexual assault of Alice Sebold in Syracuse, New York. **Exhibit 6**, Affidavit of Alex Gibney.

27.    Mr. Gibney, the president of Jigsaw Productions, LLC, is a world-renowned and celebrated documentary film director, directing numerous award-winning films, including Emmys awards and Academy Awards for Best Documentary Feature.

28.    As stated in his affidavit, Jigsaw Productions is interested in licensing the Broadwater Film. However, if the Broadwater Film is not available for licensing by Fall of this year, Mr. Gibney and Jigsaw Productions will produce the Broadwater documentary without the Broadwater Film, and the Broadwater Film will lose substantially all value.

29.     Accordingly, the offer to purchase is time-sensitive and must be concluded well before this litigation will conclude.

30.     Absent the Stipulated Injunction Order, Red Hawk would be free to sell the Broadwater Film without restrictions.

31.     Red Hawk agreed to the Stipulated Injunction Order without knowledge of the Broadwater Offer or of the urgency of selling the Broadwater Film.

## **Request for Relief**

32.     Red Hawk respectfully requests relief from the Stipulated Injunction Order to permit Red Hawk to sell the Broadwater Film to Mr. Broadwater for $130,000.

33.     Red Hawk will agree as part of an order authorizing this sale that all proceeds of the sale be held in escrow until the conclusion of this litigation or further order of the Court.

## **Basis for Relief**

34.     Courts have discretion to modify their own preliminary injunctions by either broadening or narrowing them where the original purposes of the injunction are not being fulfilled. *LFP IP, LLC v. Hustler Cincinnati, Inc.*, 810 F.3d 424, 426 (6th Cir. 2016), citing *Sys.*

8

*Fed'n No. 91, Ry. Employes' Dep't v. Wright*, 364 U.S. 642, 647, 81 S. Ct. 368 (1961); *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 248-49, 252, 88 S. Ct. 1496 (1968); and 11A Charles Alan Wright et al., Federal Practice & Procedure § 2961 (3d ed. 2015).

35.     A preliminary injunction may be dissolved or modified where the movant shows "significant changes in fact, law, or circumstances since the previous ruling." *Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402, 414 (6th Cir. 2012).

36.     Here, the Broadwater Offer, the Gibney affidavit, and the Writ of Garnishment show a significant change in facts.

37.     When the Stipulated Injunction Order was entered, Red Hawk did not know either that (1) Mr. Broadwater would be willing to purchase the Broadwater Film, (2) that the Broadwater Film was at risk of becoming worthless if not monetized by early autumn, or (3) that Mr. Mucciante had an outstanding judgment issued against him in the amount of $678,249.90 with active debt collection conducted by the United States.

38.     At the time the Stipulated Injunction Order was entered, the parties were working on the Term Sheet and Unlucky had already

agreed to pay in excess of $100,000 (the $120,000 agreement was reached two weeks after the Stipulated Injunction Order was entered). Further, previous counsel to Unlucky had represented that once an agreement was reached, Unlucky would be able to quickly make the required payment to close on the agreement. Thus, Red Hawk was led to believe that Unlucky could make the required payment.

39.     With the filing of the latest motion to withdraw, the cessation of all settlement discussions, and the issuance of the Writ of Garnishment, Red Hawk now knows that Unlucky has no ability to pay the settlement amount was never negotiating in good faith.

40.     Moreover, if Unlucky has no ability to pay the settlement amount now, Unlucky will almost certainly be unable to pay a judgment in favor of Red Hawk at the conclusion of this litigation.

41.     Thus, not only will Unlucky have dragged Red Hawk into this litigation and caused Red Hawk to incur attorneys' fees both in litigation and in Unlucky's bad faith negotiations, but at the end of all of this, Red Hawk will have no ability to collect a judgment and be made whole.

## Notice and Request for Concurrence

42.     Red Hawk presented the Broadwater Offer to Unlucky on Friday, July 26, 2024 in the hopes that the offer would spur Unlucky to either sign the completed settlement agreement or concur in the request to sell the Broadwater Film to Mr. Broadwater. One week later, Red Hawk has had no response from Unlucky.

43.     This lack of response further underscores that Unlucky never intended to make any payments to Red Hawk.

## Conclusion

44.     Therefore, in light of these new facts and circumstances, the Stipulated Injunction Order preventing Red Hawk from selling the Broadwater Film no longer fulfill its original purpose – the maintenance of the *status quo*. ECF No. 23.

45.     The parties' understanding of the *status quo* at the time the Stipulated Injunction Order was entered was that the value of the Broadwater Film would not materially change during the litigation. This is now known to be untrue – instead, the Broadwater Film will lose almost all value if not sold or licensed within the next month or two. Gibney Affidavit, **Exhibit 6**.

11

46.     To maintain the *status quo*, it is appropriate to sell the Broadwater Film now when it has value and to hold the proceeds of the sale in escrow pending the outcome of this litigation.

47.     A brief in support of this motion analyzing the propriety of a preliminary injunction in light of the newly discovered facts is attached.

WHEREFORE, Red Hawk respectfully requests that this Honorable Court modify the Stipulated Injunction Order to permit Red Hawk to sell the Broadwater Film to Mr. Broadwater and place the proceeds in an escrow account pending the conclusion of this litigation or further order of the Court, and granting such other relief in favor of Red Hawk as is just and equitable.


HEILMAN LAW PLLC


Dated:  August 2, 2024          By:   /s/ Ryan D. Heilman
                                Ryan D. Heilman (P63952)
                                Attorney for Red Hawk Films, Inc.
                                40900 Woodward Ave., Suite 111
                                Bloomfield, MI 48304
                                (248) 835-4745
                                ryan@heilmanlaw.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **UNLUCKY FILM INC.,** | **2:24-CV-10149-TGB-EAS** |
| Plaintiff, | HON. TERRENCE G. BERG |
| vs. | |
| **RED HAWK FILMS, INC.,** | |
| Defendant. | |

**BRIEF IN SUPPORT OF
RED HAWK FILMS, INC.'S MOTION FOR
PARTIAL RELIEF FROM PRELIMINARY INJUNCTION
AND ENTRY OF ORDER PERMITTING SALE OF FILM**

## I. <u>Introduction</u>.

This is a simple breach of contract case that does not require the any preliminary injunction. Red Hawk agreed to entry of the preliminary injunction order solely to avoid incurring unnecessary legal fees and unnecessarily burdening the Court's docket. At the time the preliminary injunction was agreed to, Red Hawk did not have any intention of selling the Broadwater Film and, based on representations from former counsel, Red Hawk was led to believe that Unlucky had the wherewithal to make payment promptly upon entry into a settlement agreement.

13

The facts set forth in the Gibney Affidavit and the Broadwater Offer, plus the new knowledge that Mr. Mucciante has an outstanding debt to the United States in excess of $600,000 are all changed circumstances that now make a sale of the Broadwater not only permissible, but <u>mandatory</u> for the purpose of preserving the *status quo*. Maintenance of the status quo is certainly not served by permitting the one asset with value to become worthless through passage of time. Instead, that one asset should be monetized to ensure that there some ability for either party to obtain meaningful relief in this action.

## II.  The Preliminary Injunction is a Preliminary Order that May be Revisited by the Court in Light of Changed <u>Circumstances</u>.

A preliminary injunction may be dissolved or modified where the movant shows "significant changes in fact, law, or circumstances since the previous ruling." *Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402, 414 (6th Cir. 2012); see also *LFP IP, LLC v. Hustler Cincinnati, Inc.*, 810 F.3d 424, 426 (6th Cir. 2016).

As detailed in the Motion, the Gibney Affidavit, the Broadwater Offer and the Writ of Garnishment issued against Mr. Mucciante one

month ago are all changed circumstances. Accordingly, it is appropriate

for this Court to reevaluate the preliminary injunction order.

### III.  The Preliminary Injunction Should be Lifted or Modified to Permit the Sale of the Film to Mr. <u>Broadwater</u>.

### A.  <u>Preliminary Injunction Standard</u>

The factors for determining a motion for a preliminary injunction

are well-known:

> (1) whether the movant has a 'strong' likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction.

*Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).

A preliminary injunction is "an extraordinary remedy" to be

applied only when circumstances "clearly demand it." *Id*. at 739.

Indeed, it well settled that the primary purpose of a preliminary

injunction is to preserve the *status quo*, not to grant affirmative relief.

*Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830 (1981)

("The purpose of a preliminary injunction is merely to preserve the

relative positions of the parties until a trial on the merits can be held").

Lack of likelihood of success on the merits is "usually fatal" to a preliminary injunction motion. *Gonzales v. National Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000). As discussed below, Unlucky, not Red Hawk, breached the Contract and caused all of the damages of which Unlucky now complains.

For the reasons set forth below, the facts of this case do not support maintaining the preliminary injunction.

### B. <u>Unlucky Has No Likelihood of Success on the Merits</u>.

Under applicable law, a party cannot enforce a contract if it has committed the first material breach.[3] A copy of the contract is attached as **Exhibit 7**.

Under California law, to succeed on a claim for breach of contract, plaintiff must prove (1) the existence of the contract, (2) plaintiff's

---

[3] While the Contract does specify which law applies, the law of the place of contracting (Michigan and New York) or the place where the Contract was to be performed (New York) likely applies. See generally *Chrysler Corp. v. Skyline Indus. Servs.*, 448 Mich. 113, 124-128, 502 N.W.2d 715 (1993). Nevertheless, in its own briefing but without explanation, Unlucky has assumed that California law applies. Fortunately, choice of law is unlikely to be material as all of California, Michigan and New York recognize the doctrine of first material breach or similar doctrines prohibiting a defaulting party from enforcing a contract, and none of these jurisdictions would permit a party to obtain a product or services for which it did not pay the contractually agreed price.

performance or excuse for nonperformance, (3) defendant's breach, and (4) resulting damages to the plaintiff. *Oasis West Realty, LLC v. Goldman*, 51 Cal.4th 811, 821, 250 P.3d 1115 (Cal. 2011). With respect to the second element, a material breach of contract may relieve the non-breaching party from its duty to perform under the contract. *Brown v. Grimes*, 192 Cal.App.4th 265, 277-278 (Cal. App. 2011).

Similarly, "[t]he rule in Michigan is that one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform." *Michaels v Amway Corp*, 206 Mich App 644, 650; 522 NW2d 703 (1994) (quotation marks and citations omitted).

Under New York law, a party's first material breach and repudiation of a contract excuses performance on the part of the non-breaching party. *Ergonomic Sys. Phil. Inc. v. CCS Int'l Ltd.*, 777 N.Y.S.2d 446, 447, 7 A.D.3d 412, 413-414 (2015); *Nomura Asset Capital Corp. v. Cadwalader*, 889 N.Y.S.2d 506 (2009), citing Restatement [Second] of Contracts § 237.

Here, the Contract clearly requires that Unlucky make *advances* for production of the Picture and pay Red Hawk its producer service

fees. Unlucky did not make advances and only made partial reimbursements after a lengthy delay and a multitude of false promises. After receipt of only partial payment and reimbursements, and without advances for the costs of further production, Red Hawk had no choice but to cancel further production activities to mitigate damages. Red Hawk provided Unlucky ample opportunity to comply with its obligations under the Contract, but ultimately terminated the Contract due to Unlucky's failure and refusal to make the contractually required advances and payments. See Invoices, **Exhibit 8**; Declaration of Scott Rosenbaum, **Exhibit 9**; Text Messages, **Exhibit 10**; and Default Notice, **Exhibit 11**.

Nothing in California, Michigan or New York law can be construed to permit Unlucky to obtain goods and services after it defaulted on the Contract and has continuously failed and refused to cure the default or make contractually required payments.

To the extent Unlucky argues that Red Hawk "failed to document expenses or provide an accounting," or "manufactured expenses and

engaged in fraud,"[4] (Plaintiff's Injunction Brief, ECF No. 3, p. 15) or breached its obligations by sharing the film or otherwise breaching confidentiality or other provisions of the Contract (Plaintiff's Injunction Brief, pp. 15-16), even if a breaching party could enforce these provisions, the allegations are entirely false. Rosenbaum Declaration. These allegations are simply *post facto* excuses for Unlucky's own breach of the Contract.

### C. <u>Unlucky Would Suffer No Irreparable Harm</u>.

The Broadwater Film has value to either Red Hawk or Unlucky only to the extent that the Broadwater Film can be monetized. As set forth in the Gibney Affidavit, Mr. Gibney and Jigsaw Productions intend to make a documentary concerning Mr. Broadwater's unjust incarceration and eventual exoneration this fall with or without the Broadwater Film. Given Mr. Gibney's award-winning credentials and standing in the field of documentary films, it is highly unlikely that any other serious production company would compete with Mr. Gibney by

---

[4] With respect to the allegation that third party expenses were not paid, any failure to pay was entirely the fault of Unlucky's failure to make required advances. Contract, ¶3. Nevertheless, Red Hawk paid costs and expenses out of its own pocket in an attempt to continue the production.

making yet another documentary after release of a film by Jigsaw Productions. Thus, the Broadwater Film will lose its value and both parties will be irreparably harmed if Red Hawk is not permitted to sell the Broadwater Film.

The "irreparable harm" alleged by Unlucky in support of the injunction is, itself, nothing more than alleged monetary damages (in the unlikely event that Unlucky succeeds in this lawsuit). **Money damages do not justify imposition of a preliminary injunction**. *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578-79 (6th Cir. 2002).

One of the few exceptions to the rule that monetary damages do not justify injunctions is where a defendant (or here, Unlucky as counter-defendant) would be unable to satisfy any judgment issued by the Court after full litigation. See, e.g., *Salita Promotions Corp. v. Ergashev*, 500 F. Supp. 3d 648, 654-655 (E.D. Mich. 2020), citing *Canon Inc. v. GCC Int'l Ltd.*, 450 F. Supp. 2d 243, 256 (S.D.N.Y. 2006) and 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.1 (3d ed. 2020). Thus, Red Hawk, not Unlucky, is likely to suffer irreparable harm.

Given (i) the outstanding Writ of Garnishment issued just last month, (ii) the outstanding judgment of restitution in Macomb County, (iii) Unlucky's refusal to complete the already-negotiated settlement agreement, and (iv) Unlucky' inability to retain any counsel in this case, it is highly unlikely that Unlucky will be able to satisfy any judgment entered in this case in Red Hawk's favor. Accordingly, Red Hawk will suffer irreparable harm if the injunction is not lifted or modified. Unlucky, however, will suffer no irreparable harm.

Further, all Unlucky's supposed damages are entirely the result of Unlucky's own breach of contract. Unlucky could easily avoid all the purported harms simply by tendering payment of the amounts owed to Red Hawk under the Contract or by completing the settlment. Unlucky's failure to do so belies Unlucky's extravagant claims of irreparable harm.

Finally, Unlucky should not be permitted to retain the preliminary injunction because it comes to this Court with unclean hands. *Big Time Worldwide Concert & Sport Club at Town Ctr. v. Marriott Int'l*, 236 F. Supp. 2d 791, 797 (E.D. Mich. 2003). Unlucky not only breached the Contract, but lied and made repeated false

21

statements that payment would be forthcoming or had already been electronically transferred, all to keep Red Hawk working on production of the Picture at Red Hawk's own cost. Rosenbaum Affidavit, ¶¶9-10. Unlucky then sued Red Hawk and negotiated a settlement agreement in bad faith knowing the entire time that it had no ability to pay the promised settlement funds.

### D. Lifting of the Preliminary Injunction Would the Public Interest.

The public has an interest in the enforcement of contracts according to their terms. E.g. *Material Handling Sys. v. Cabrera*, 572 F. Supp. 3d 375, 380 (W.D. Ky. 2021). The terms here require payment to Red Hawk to reimburse Red Hawk for its expenses and to provide the contractually required fees. The public does not have an interest in granting a defaulting party goods or services for which it did not pay, or in granting such a party preliminary relief against the very same vendor that Unlucky stiffed.

The public also has an interest in viewing the Broadwater Film – unique film shot by Red Hawk during the proceedings during which Mr. Broadwater was exonerated. The Broadwater Film includes interviews and footage that cannot be replicated and, given the very public nature

of Mr. Broadwater's conviction and exoneration, the public has an interest in being able to view this footage.

## IV.   <u>Conclusion.</u>

For all the reasons set forth above, Red Hawk requests that this Honorable Court grant Red Hawk's Motion, modify the preliminary injunction to permit Red Hawk to sell the Broadwater Film to Mr. Broadwater, and hold the proceeds of the sale in escrow pending the conclusion of this litigation or further order of this Court.

Respectfully submitted,

HEILMAN LAW PLLC

Dated:  August 2, 20234          By:   /s/ Ryan D. Heilman
                                      Ryan D. Heilman (P63952)
                                      Attorney for Red Hawk Films, Inc.
                                      40900 Woodward Ave., Suite 111
                                      Bloomfield, MI 48304
                                      (248) 835-4745
                                      ryan@heilmanlaw.com

## <u>EXHIBIT INDEX</u>

| EXHIBIT 1 | Proposed Order |
| --- | --- |
| EXHIBIT 2 | Term Sheet Agreed to By Both Parties |
| EXHIBIT 3 | United States Garnishment Against Mr. Mucciante |
| EXHIBIT 4 | Macomb County Docket Sheet |
| EXHIBIT 5 | Mr. Broadwater's Purchase Offer |
| EXHIBIT 6 | Affidavit of Alex Gibney |
| EXHIBIT 7 | Production Services Agreement (the "Contract") |
| EXHIBIT 8 | Invoices |
| EXHIBIT 9 | Declaration of Scott Rosenbaum |
| EXHIBIT 10 | Text Messages between Timothy Mucciante and Scott Rosenbaum |
| EXHIBIT 11 | February 2, 2022 Default Notice |
| | |

# EXHIBIT 1

# Proposed Order

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **UNLUCKY FILM INC.,** | **2:24-CV-10149-TGB-EAS** |
| Plaintiff, | HON. TERRENCE G. BERG |
| vs. | |
| **RED HAWK FILMS, INC.,** | |
| Defendant. | |

### [PROPOSED] ORDER GRANTING
### PARTIAL RELIEF FROM PRELIMINARY INJUNCTION
### AND PERMITTING SALE OF FILM

Now before the Court is the Motion for Partial Relief from
Preliminary Injunction and Entry of Order Permitting Sale of Film
("Motion") filed by Defendant and Counter-plaintiff Red Hawk Films,
Inc. ("Red Hawk").

Through the Motion, Red Hawk seeks to have the stipulated
preliminary injunction ("Preliminary Injunction," ECF No. 23) modified
to permit Red Hawk to sell certain film to Anthony Broadwater.

The Court, being fully advised, hereby finds that due to changed
factual circumstances, the continuation of the Preliminary Injunction is
no longer appropriate. In particular, the Court finds the following facts

which were not present or known when the Preliminary Injunction was

stipulated to and entered:

1. An offer to purchase the film was received after the
   Preliminary Injunction was issued, with a deadline for
   completing the sale of August 31, 2024.

2. Due to the planned production of documentary to be completed
   in the autumn of 2024, the film is at risk of losing substantial
   value if it is not sold promptly.

3. Counter-Defendant Unlucky Film, Inc. appears to be
   experiencing financial difficulties such that, absent the sale of
   the film, there would be no likelihood that Red Hawk, as
   Counter-plaintiff, would be able to collect on any judgment
   entered in its favor in this litigation.

Therefore, as a result of the these changed circumstances, the

Court finds that maintaining the Preliminary Injunction no longer

serves its original purpose – the maintenance of the *status quo*. Instead,

maintaining the Preliminary Injunction would deplete the value of the

film and risk rendering Unlucky Film, Inc. ("Unlucky") essentially

judgment proof.

In deciding to modify the Preliminary Injunction, this Court has

considered:

(1) whether the movant has a 'strong' likelihood of success on
the merits; (2) whether the movant would otherwise suffer
irreparable injury; (3) whether issuance of a preliminary
injunction would cause substantial harm to others; and (4)

> whether the public interest would be served by issuance of a preliminary injunction.

*Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).

The Court finds, in light of the changed circumstances, that each of the factors weighs against maintaining the Preliminary Injunction and in favor of modifying the Preliminary Injunction.

In particular, the Court finds that Red Hawk has established a likelihood of success on the merits of its claims that Unlucky breached the contract between the parties and failed to make contractually required payments. Unlucky will not suffer any irreparable harm from the modification of the Preliminary Injunction as all Unlucky's asserted damages are fully compensable by money damages. Red Haw,, in contrast, has shown that maintaining the Preliminary Injunction will cause it irreparable harm because Unlucky is highly unlikely to have any ability to satisfy a judgment and the proceeds of the film are likely the only source of any recovery for Red Hawk.

Modifying the Preliminary Injunction will not cause harm to any others but will, likely, benefit others by permitting the film to be used in a documentary currently in production. Further, modifying the Preliminary Injunction is in the public interest as doing so will permit

3

the public to view film relating to the exoneration of Mr. Broadwater, a matter of public interest.

Therefore, the Preliminary Injunction Order entered at ECF No. 23 is hereby modified to permit Red Hawk to sell the film to Mr. Broadwater on the terms set forth in the purchase offer attached to Red Hawk's Motion. The proceeds of the sale will be held in an escrow account maintained by Red Hawk's counsel pending final resolution of this litigation or further Order of this Court. Notwithstanding anything to the contrary in the Preliminary Injunction, Red Hawk may take such actions and make such disclosures as are necessary to complete the sale and comply with this Order.

**IT IS SO ORDERED**

_____
UNITED STATES DISTRICT JUDGE

DATED: _____

4

EXHIBIT 2

Term Sheet

## <u>SETTLEMENT TERM SHEET</u>

In settlement of Unlucky Film Inc. v. Red Hawk Films, Inc., Case No. 2:24-cv-10149 (the "<u>Lawsuit</u>"), Unlucky Film Inc. ("<u>Unlucky</u>") and Red Hawk Films, Inc. ("<u>Red Hawk</u>") agree as follows:

1. Unlucky will make a one-time payment to Red Hawk in the amount of $120,000 in full release and satisfaction of all claims and damages alleged by Red Hawk against Unlucky, including for amounts invoiced and unpaid, breach of contract, attorneys' fees and interest (the "<u>Settlement Amount</u>").

2. Red Hawk will deliver to Unlucky all film produced by Red Hawk relating to the contract between Red Hawk and Unlucky, consisting of film produced between October 21, 2021 through December 15, 2021 (the "<u>Film</u>").

3. At Unlucky's sole cost, prior to delivery of the Film to Unlucky, Unlucky may have an independent examiner, acceptable to Red Hawk, examine the hard drives on which the Film is stored to verify only (i) that the hard drives contain film and (ii) that none of the Film has been deleted. The examination shall occur in New York, New York or at another place acceptable to Red Hawk and a representative of Red Hawk shall have the opportunity to be present for the duration of the examination.

4. Upon completion of the examination (or waiver of the examination by Unlucky), the Film shall be delivered to Red Hawk's counsel, and upon receipt of the Settlement Amount via a wire transfer initiated from Unlucky's counsel, the Film will be immediately delivered to Unlucky's counsel.

5. Contemporaneous with the delivery of the Film, each party shall deliver a broad mutual release releasing Unlucky and Red Hawk, including all their respective officers, employees, agents, etc. and specifically including Borzu Mehrad, Red Hawk's editor and all sub-contractors hired by Red Hawk. Additionally, the lien filed against Mr. Mehrad in New Jersey will be released.

6. Promptly after receipt of the Film, Unlucky will dismiss the Lawsuit with prejudice.

7. This term sheet is not binding. If the terms are agreeable to each party, the parties intend to draft a definitive settlement agreement and mutual releases incorporating these terms.

EXHIBIT 3

Writ of Garnishment

10

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

           Plaintiff,                Case No.: 24-MC-50817

v                                  Hon.

TIMOTHY MUCCIANTE,

           Defendant,

and

MICHIGAN DEPARTMENT
OF TREASURY,
UNCLAIMED PROPERTY,

           Garnishee.

_____/

**FILED**

**JUL 0 3 2024**

**CLERK'S OFFICE**
**DETROIT**

## WRIT OF CONTINUING GARNISHMENT

GREETINGS TO: Michigan Department of Treasury
                      Unclaimed Property
                      Attn: Laura Herrin
                      P.O. Box 30756
                      Lansing, MI 48909

An application for a Writ of Continuing Garnishment against the property of

Timothy Mucciante, whose Social Security Number is ***-**-5165, has been filed to

enforce a criminal judgment for restitution on behalf of the United States. As of July

2, 2024, the outstanding balance is $678,249.90.

The name and address of the Garnishee is:

Michigan Department of Treasury
Unclaimed Property
Attn: Laura Herrin
P.O. Box 30756
Lansing, MI 48909

The name and address of counsel for the United States is:

Jessica A. Nathan, AUSA
211 W. Fort St., Ste. 2001
Detroit, MI 48226

The last known address of Timothy Mucciante is:

Timothy Mucciante
REDACTED
Grand Blanc, MI 48439

Pending further order of this Court, you shall withhold and retain all property in which Timothy Mucciante has a substantial nonexempt interest and for which you are or may become indebted to Timothy Mucciante, including but not limited to unclaimed property, disposable earnings and/or wages, and any retirement or investment accounts. *See* 28 U.S.C. § 3205(c)(2)(F). Property that is exempt and that is not subject to this Writ is listed in the enclosed Clerk's Notice. Do not deliver the property to the United States District Clerk at this time. Instead, withhold and retain the property until the Court orders its distribution. *Id.*

**You are required by law to file an Answer in writing, under oath, within ten (10) days, whether or not you have, or may in the future have, in your custody, control or possession, any property owned by the debtor,**

**Timothy Mucciante, including non-exempt, disposable earnings and any retirement or investment accounts.**

If you are represented by counsel who is an Electronic Case Files (ECF) system user in the Eastern District of Michigan, your attorney may file your Answer electronically in ECF. Otherwise, mail or deliver the original answer to the United States District Clerk at: Theodore Levin U.S. Courthouse, 231 W. Lafayette Blvd., Room 599, Detroit, MI 48226. A copy of your Answer must also be served upon the debtor, Timothy Mucciante, with a last known address in Grand Blanc, MI 48439, and upon the attorney for the Government: Jessica A. Nathan, United States Attorney's Office, 211 W. Fort St., Ste. 2001, Detroit, MI 48226. A sample Answer Form is included for your convenience.

Pursuant to the provisions of Section 3613(a) of Title 18, there may be property which is exempt from this writ of Garnishment. All non-exempt property belonging to Timothy Mucciante, including but not limited to twenty-five percent (25%) of the non-exempt disposable earnings currently owed and owed in the future to the debtor, Timothy Mucciante, must be withheld from and retained by you pending further order of the Court.

It is unlawful to pay or deliver to the defendant any item attached by this Writ. If you fail to answer this Writ or withhold property in accordance with this writ, the United States of America may petition the Court for an order requiring you to appear

before the Court. *See* 28 U.S.C. § 3205(c)(6). If you fail to appear or do appear and fail to show good cause why you failed to comply with this Writ, the Court may enter a judgment against you for the value of the debtor's non-exempt property. *Id.* Additionally, you may be held liable for a reasonable attorney's fee to the United States of America. *Id.*

KINIKIA ESSIX
UNITED STATES DISTRICT COURT CLERK
EASTERN DISTRICT OF MICHIGAN

Dated: 7·3·2024    By: _____
                        Deputy Clerk

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,                      Case No.: 24-MC-50817

v                                              Hon.

TIMOTHY MUCCIANTE,

                    Defendant,

and

MICHIGAN DEPARTMENT
OF TREASURY,
UNCLAIMED PROPERTY,

                    Garnishee.

_____/

## CLERK'S NOTICE OF GARNISHMENT

You are hereby notified, pursuant to 28 U.S.C. § 3202, that a garnishment is being taken by the United States of America, which has a judgment in Case No.: 02CR80128 01 in the United States District Court for the Eastern District of Michigan, Southern Division in the sum of $831,934.51. As of July 2, 2024, the outstanding balance is:

| | |
|---|---|
| $726,138.25 | Judgment Amount[1] |
| ( $47,888.35) | Credits applied to Judgment[2] |
| $678,249.90 | Debt balance |

Exemptions may protect the property from being taken by the United States if you can show exemptions apply. Below is a summary of the only exemptions that apply to the enforcement of judgments for criminal fines and restitution under 18 U.S.C. § 3613(a)(1) and 26 U.S.C. §§ 6334(a):

1. Wearing apparel and school books. 26 U.S.C. § 6334(a)(1).

2. Fuel, provisions, furniture, and personal effects that do not exceed $11,390.00. 26 U.S.C. §§ 6334(a)(2) & (g).

3. Books and tools of a trade, business, or profession that do not exceed $5,700.00. 26 U.S.C. § 6334(a)(3) & (g).

4. Unemployment benefits. 26 U.S.C. § 6334(a)(14).

5. Undelivered mail. 26 U.S.C. § 6334(a)(5).

6. Certain annuity and pension payments.–Annuity or pension payments under the Railroad Retirement Act, benefits under the Railroad Unemployment Insurance Act, special pension payments received by a person whose name has been entered on the Army, Navy, Air Force, and Coast Guard Medal of Honor Roll, and annuities based on retired or retainer pay. 26 U.S.C. § 6334(a)(6).

---

[1] The judgment imposed a $100.00 mandatory special assessment under 18 U.S.C. § 3013 plus $726,038.25 in restitution under 18 U.S.C. § 3664. ECF No. 17. Interest is not accruing on the debt. *Id.*

[2] Pursuant to 18 U.S.C. § 3612, payments are applied first to special assessments, then to restitution to all victims. Defendant has also been given credit for payments received from jointly and severally liable co-defendants in accordance with 18 U.S.C. § 3664(h) if applicable.

7. Workmen's compensation. 26 U.S.C. § 6334(a)(7).

8. Judgments for support of minor children, pursuant to a court judgment entered prior to the date of levy, to contribute to the support of defendant's minor children. 26 U.S.C. § 6334(a)(4)(8).

9. Certain service-connected disability payments. 26 U.S.C. § 6334(a)(10).

10. Assistance under Job Training Partnership Act. 26 U.S.C. § 6334(a)(12).

If you are defendant, Timothy Mucciante, you have a right to ask the Court to return your property to you if you think you do not owe the debt to the Government, or if you think the property the Government seeks qualifies under one of the above exemptions.

**There is no exemption solely because you are having difficulty paying your debts.**

**If you want a hearing, you must notify the Court within 20 days after you receive this notice. 28 U.S.C. § 3202(d). Your request must be in writing.** You may use the attached form to request the hearing. If you are represented by counsel who is an Electronic Case Files (ECF) system user in the Eastern District of Michigan, your attorney may file your Claim for Exemption and Request for Hearing or Transfer Form electronically in ECF. Otherwise, mail or deliver the original request to the United States District Clerk at: Theodore Levin U.S. Courthouse, 231 W. Lafayette Blvd., Room 599, Detroit, MI 48226. You must also mail a copy to AUSA Jessica A. Nathan, 211 W. Fort St., Ste. 2001, Detroit, MI 48226 so the

government will know you want a hearing.

If you request a hearing in writing, the court shall hold a hearing, within 5 days after the date the request is received by the court, or as soon thereafter as is practicable, and give notice of the hearing date to all the parties. 28 U.S.C. § 3202(d).

**At the hearing you must be prepared to explain to the judge why you believe the property the Government seeks is exempt or why you think that you do not owe the debt to the Government.** *Id*. If you do not request a hearing, your property may be delivered to the United States and applied to the debt you owe. *Id*.

You will receive a copy of the Answer, as prepared by the Garnishee. **If you do not agree with the information as set forth by the Garnishee you may request a hearing. If you want a hearing, you must notify the court within 20 days after receipt of the Answer. 28 U.S.C. § 3205(c)(5). Your request must be in writing.** You may use the attached form to request the hearing. If you are represented by counsel who is an ECF system user in the Eastern District of Michigan, your attorney may file your Claim for Exemption and Request for Hearing or Transfer Form electronically in ECF. Otherwise, mail or deliver the original request to the United States District Clerk at: Theodore Levin U.S. Courthouse, 231 W. Lafayette Blvd., Room 599, Detroit, MI 48226. You must also mail a copy to AUSA Jessica A. Nathan, 211 W. Fort St., Ste. 2001, Detroit, MI 48226 so the government will know you want a hearing.

If you request a hearing in writing, the court shall hold a hearing, within 10 days after the date the request is received by the court, or as soon thereafter as is practicable, and give notice of the hearing date to all the parties. *Id.*

**If you think you live outside the federal judicial district where this Court is located, you may request, not later than 20 days after you receive this notice, that this proceeding be transferred by this Court to the federal judicial district in which you reside. 28 U.S.C. § 3202(d). You must make your request in writing.** If you are represented by counsel who is an ECF system user in the Eastern District of Michigan, your attorney may file your Claim for Exemption and Request for Hearing or Transfer Form electronically in ECF. Otherwise, mail or deliver the original request to the United States District Clerk at: Theodore Levin U.S. Courthouse, 231 W. Lafayette Blvd., Room 599, Detroit, MI 48226. You must also mail a copy to AUSA Jessica A. Nathan, 211 W. Fort St., Ste. 2001, Detroit, MI 48226 so the government will know you want the proceeding transferred.

Be sure to keep a copy of this notice for your own records. If you have any questions about your rights or about this procedure, you should contact a lawyer or an office of public legal assistance. *The Clerk or the Court is not permitted to give legal advice but may refer you to other sources of information.*

KINIKIA ESSIX
UNITED STATES DISTRICT COURT CLERK
EASTERN DISTRICT OF MICHIGAN

Dated: 7·3·2024    By: _____

Deputy Clerk

mb

EXHIBIT 4

Macomb County
Docket Sheet

## 2009-002020-FH PEOPLE vs. MUCCIANTE, TIMOTHY MATHEW RLC

- Case Type:
- FH-NONCAPITAL FELONIES

- Case Status:
- Closed

- File Date:
- 05/04/2009

- DCM Track:
-

- Action:
- EMBEZZLE.-AGENT/TRUSTEE OVER $20,000

- Status Date:
- 05/04/2009

- Case Judge:
- CARETTI, RICHARD L

- Next Event:
- 08/05/2024

| All Information | Docket | Party | Charge | Ticket/Citation # | Event | Financial | Receipt | Disposition |

### Financial Summary

| Cost Type | Amount Owed | Amount Paid | Amount Adjusted | Amount Outstanding |
|---|---|---|---|---|
| CVRS FEES | $60.00 | $60.00 | $0.00 | $0.00 |
| DEFENSE COSTS | $40.00 | $15.00 | $0.00 | $25.00 |
| 20% LATE FEE | $9,583.39 | $0.00 | ⓘ $9,583.39 | $0.00 |
| STATE MINIMUM COSTS | $136.00 | $136.00 | $0.00 | $0.00 |
| VICTIM RESTITUTION | $48,000.00 | $3,989.17 | $0.00 | $44,010.83 |
| | $57,819.39 | $4,200.17 | $9,583.39 | $44,035.83 |

- **Money on Deposit with the Court**

| Account | Applied Amount |
|---|---|
| RESTITUTION ACCOUNT | $0.00 |
| | $0.00 |

# EXHIBIT 5

# Purchase Offer



## Berlandi Nussbaum & Reitzas LLP
### Attorneys at Law

125 Park Avenue | 25th Floor
New York, New York 10017

Telephone: 212-804-6329
Facsimile: 646-461-2312

www.bnrllp.com

July 25, 2024

**_VIA EMAIL_**

**RED HAWK FILMS**
Attn: Scott Rosenbaum
116 Bacon Road
Old Westbury, NY 11568

**HEILMAN LAW PLLC**
Attn:  Ryan Heilman, Esq.
40900 Woodward Ave., Suite 111
Bloomfield Hills, MI 48304

Re:  __Formal Offer to Purchase Material Filmed regarding Anthony Broadwater__

Dear Messrs. Rosenbaum and Heilman,

This Firm represents Anthony Broadwater with respect to the above-referenced matter.  As you both know, Red Hawk Films (herein, "Red Hawk") currently possesses what we believe to be at minimum dozens of hours of filmed footage relating to Mr. Broadwater.  Such footage, to the best of our knowledge, includes interviews of Mr. Broadwater and numerous others, as well as recordings of live events surrounding the vacatur of Mr. Broadwater's prior criminal conviction in November of 2021 (herein collectively, the "**Broadwater Media**").

This Firm is also aware that Red Hawk created the Broadwater Media under a production services agreement that entitled Red Hawk to payment, and that Red Hawk did not receive payment in full for its services.

Though a third party, either Hidden Oaks, LLC (d/b/a Medici Media) or Unlucky Film, Inc. had at one point intended to produce a documentary regarding the events of Mr. Broadwater's life – it appears evident from the ongoing litigation between Red Hawk and Unlucky Film, Inc. that no such documentary can be made.  Further, we are aware that another party, Jigsaw Productions, is currently producing a documentary on Mr. Broadwater's life, conviction, and exoneration (the "Jigsaw Film").  We believe the Jigsaw Film is currently scheduled to air on HBO, potentially as soon as late this year.

It is Mr. Broadwater's strong desire that the Broadwater Media be available for the Jigsaw Film.  This is by definition an extraordinarily personal matter for Mr. Broadwater, and he places great value in Red Hawk's work.

It is for that reason that Mr. Broadwater wishes to purchase the Broadwater Media from Red Hawk, and makes the following offer for the Broadwater Media:  one-hundred and thirty thousand

Red Hawk Films
July 25, 2024
Page | 2



dollars ($130,000.00) US as follows:  fifty-thousand dollars US ($50,000.00) upon execution of a formal purchase agreement, and eighty-thousand dollars US ($80,000.00) upon confirmed delivery of the Broadwater Media.

Mr. Broadwater recognizes that the rights to the Broadwater Media is in dispute in the United States District Court of Michigan, and that Red Hawk's ability to accept this offer depends on that Court. However, time is of the essence for Mr. Broadwater as well.  If the Jigsaw Film finishes filming prior to a sale of the Broadwater Media, the Broadwater Media (despite its immense value to Mr. Broadwater) will become effectively worthless in the market.

In light of this, we request that Red Hawk expedite consideration of this offer, and if Red Hawk finds it agreeable, promptly move the aforementioned Court in Michigan to permit the sale.  We kindly request that Red Hawk answer this offer not later than **August 3, 2024** and, if accepted, Red Hawk make the appropriate motion such that it may be heard before the end of August, 2024.

We appreciate your understanding and cooperation in this matter and are committed to facilitating a smooth and expedient process to bring this proposal to fruition. Please do not hesitate to reach out should you require any further information, clarification, or wish to discuss any aspects of the proposal in greater detail.  All rights not expressly waived herein are preserved.

On behalf of Mr. Broadwater, thank you for your consideration.

Kind regards,

**BERLANDI NUSSBAUM & REITZAS LLP**

By:    *John O'Brien*
       _____
       John P. O'Brien

Cc:    Client  (*via email*)
       Joshua T. Reitzas, Esq. (*via email*)
       J. David Hammond, Esq. (*via email*)

*Agreed to and Acknowledged:*    _____
                                 Scott Rosenbaum, on behalf of Red Hawk Films

EXHIBIT 6

Affidavit of Alex Gibney

## **AFFIDAVIT**

Reference is made to certain footage shot by Red Hawk Films relating the story of Anthony Broadwater (the "Footage").

Alex Gibney hereby affirms as follows:

1.  I am a filmmaker by profession and the founder of the production company Jigsaw Productions LLC ("Jigsaw").

2. Jigsaw is producing a documentary film (the "Documentary") regarding the Anthony Broadwater story for HBO.

3. I am aware of the Footage shot by Red Hawk Films in late 2021 relating to the story of Anthony Broadwater.

4. Jigsaw is interested in licensing the Footage for use in the Documentary from whichever entity is authorized to license it.  Jigsaw tried to license the Footage on previous occasions directly from Timothy Mucciante.

5. If Jigsaw is unable to license the Footage by Fall of 2024, the Footage will no longer be valuable to Jigsaw because it is unlikely that Jigsaw will be able to incorporate the Footage into the Documentary, based on the approved production schedule for the Documentary.

6. In my opinion, as a filmmaker who has produced more than 100 documentary projects, once our film is released (On HBO, with the cooperation of Anthony Broadwater and many of the other key participants in the story), it is extremely unlikely that other filmmakers will make a documentary project about the same subject matter. Therefore, the value of the Footage will likely be diminished.

I certify under penalty that the foregoing statements are true and correct.

_____
Alex Gibney

State of _____Florida_____ )

County of ___Nassau___ )

On the 23 day of ___July___ 2024 before me, ___Aleksandr Kozlov___, a Notary Public, _Philip Alexander Gibney_ personally appeared before me/is personally known to me to be the person whose name is subscribed to the within instrument and _Philip Alexander Gibney_ acknowledged to me that he/she is the same in his/her authorized capacity and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

ID produced: Driver License

WITNESS my hand and official seal.

Notarized online using audio-video communication



ALEKSANDR KOZLOV
Notary Public - State of Florida
Commission # HH 461002
Expires on November 2, 2027

Aleksandr Kozlov

EXHIBIT 7

The Contract

<u>PRODUCTION SERVICES AGREEMENT</u>

THIS PRODUCTION SERVICES AGREEMENT ("Agreement") is dated as of September 1, 2021, and is between Unlucky Film, Inc. ("Company") and Red Hawk Films, Inc. ("Producer"), with respect to the documentary motion picture tentatively entitled "Unlucky" (the "Picture").

1.     <u>PRODUCTION</u>

(a) <u>Engagement</u>:  Company hereby engages Producer on an independent contractor basis to provide all production services and other elements requested by Company or otherwise necessary, desirable or appropriate for the production, completion and delivery to Company of the Picture, including without limitation, all necessary personnel, services, facilities, equipment and material, except for those items which Company notifies Producer that Company will handle itself.  Producer hereby accepts such engagement upon the terms and conditions set forth herein.  Producer agrees that all contracts and agreements with persons or entities rendering services, furnishing facilities, equipment or other material or granting rights in connection with such production, completion and delivery shall be entered into in Producer's name unless Company specifies otherwise, and shall contain terms and conditions customary in the motion picture industry for the applicable type of services, material or rights being rendered, furnished or granted and shall be fully assignable to Company.  Producer shall obtain from all interviewees and performers a signed consent in the form submitted to Producer by Company.  All rights and benefits flowing to Producer under each such agreement shall be deemed, and hereby are, assigned to Company concurrently with the effectiveness of such agreement.  All the above-the-line and key below-the-line agreements shall be subject to prior approval by Company.  Any product placement and/or barter agreements shall be subject to prior approval by Company.  It is further agreed that Producer shall fully and completely satisfy and discharge all obligations and liabilities undertaken by Producer in connection with each such contract and agreement.

(b) <u>Production Consultations and Approvals</u>:  All of Producer's services and activities hereunder shall be subject to the supervision, direction and control of Company.  Without limiting the generality of the preceding sentence, Producer shall consult with Company throughout the production of the Picture and shall obtain Company's prior approval for all artistic, creative, technical, financial and business elements and decisions in connection with the production of the Picture and the rendition of Producer's services hereunder.  Without limiting the generality of the foregoing, Producer shall submit for Company's approval, on or before such reasonable dates as Company shall hereafter designate, the following elements of the Picture (the "Elements"), including any substitutes therefor or material changes therein:

(i)     all interviewees, consultants and any performers;

(ii)     all final above-the-line and below-the-line elements of the Picture, including without limitation the executive producer, director, line producer, associate producer, director of photography, editor, art director, music coordinator, composer and unit production manager (Company hereby preapproves Scott Rosenbaum as director/producer and Tony Grazia as producer);

(iii)     the compensation and other terms of engagement of the personnel referred to in (i) and (ii) above.  In this regard, Producer shall not enter into any agreement relating to the Picture which provides for any participations in net profits of the Picture or any other form of contingent compensation;

(iv)     a final production and delivery schedule (upon final approval thereof by Company, the "Schedule"), specifying the number of shooting days, the locations, the delivery dates for rough cuts and final cuts, the dates designated by Company for the final delivery of the "Delivery Items" (as such term is defined in Subparagraph (c) below) the ("Delivery Dates"); provided it is hereby acknowledged that by the nature of documentary filmmaking, photography will be done in segments, depending on the timing of events and the availability of interviewees, with separate production and delivery schedules for segments, each subject to Company's prior approval;

(v)     a final detailed above-the-line and below-the-line production budget (including fees payable to Producer) (such production budget in the final form approved by Company shall hereinafter be referred to as the "Budget"); provided it is hereby acknowledged that by the nature of documentary filmmaking, photography will be done in segments, depending on the timing of events and the availability of interviewees, with separate production budgets for segments, each subject to Company's prior approval;

(vi)     the title and proposed running time of the Picture;

(vii)     evidence satisfactory to Company that Producer has obtained all rights and licenses (except as otherwise owned or controlled by Company) necessary for Producer to produce the Picture and assign the rights assigned to Company hereunder in accordance with all of the terms of this Agreement; and

(viii)     the pre-script outline(s) and the final post-shoot script of the Picture.

In the event that Company disapproves any one or more of the Elements set forth in Subparagraph 1(b) above, Producer shall find a substitute Element acceptable to Company.

(c) <u>Delivery</u>:  Producer shall produce the Picture in accordance with the Budget and the Schedule and all the provisions of this Agreement and shall deliver the Picture on or before the Delivery Dates.  Without limiting the generality of the foregoing, Producer shall timely deliver all of the items, materials and elements required to be delivered by Company pursuant to any agreement between Company and its distributors and all of the items, materials and elements which could reasonably be deemed necessary by Company to conform to any other foreign or domestic distribution agreement for distribution of the Picture in any media (all of the foregoing items, materials and elements are collectively referred to as the "Delivery Items").

(d) <u>Production Reports</u>:  Periodically during principal photography of the Picture, Producer shall furnish Company a written statement of (i) the amount required by Producer for production commitments during the succeeding period; (ii) all expenditures and commitments made during the preceding period; (iii) a cumulative statement of all expenditures and commitments made in respect of the Picture up to the last day of each such period and (iv) an estimate of the amount required to complete each budget item.  Such statements shall be furnished on a monthly basis, or as required by Company taking into account the flow of production.  In addition, Producer shall (i) promptly notify Company of any occurrence which does or might delay or interfere with the production of the Picture; (ii) keep and maintain accurate books and records with respect to the Picture; and (iii) furnish to Company copies of all vouchers, receipts and other documents relating to all receipts, expenses and charges incurred and items

2

received by Producer in connection with the production of the Picture, which books and records shall be available at all times during regular business hours to Company and its representatives or designees for audit and informational proposes.

       (e) <u>Requests for Changes</u>:  Producer shall make (at its sole expense) all changes to the Picture and the material contained therein as are timely and reasonably requested by Company; provided that in the event Company requests changes in material previously approved by Company and Producer has otherwise complied with all of the provisions of this Agreement, such changes shall be made by Producer at Company's expense.

       2.    <u>OWNERSHIP AND COPYRIGHT</u>

       (a)  Producer shall produce the Picture and all constituent elements thereof as works made-for-hire specially ordered or commissioned by Company with Company being deemed the sole author of all such results and proceeds.  Company shall be the sole and exclusive owner of, and Producer hereby grants, assigns and transfers to Company, all rights in and to the Picture, and all copyrights therein, including, without limitation, all of Producer's right, title and interest in music included in the Picture, and all underlying works, including without limitation, the scripts, and all the results and proceeds of Producer's and all other persons' services engaged in connection with the Picture and, without limiting the generality of the foregoing, Company shall have the sole and exclusive right to distribute, use, transmit, display, exhibit, exploit, project, license, simulcast, advertise, promote, publicize, perform and otherwise turn to account (hereinafter collectively "Distribution" and/or "Distribute" as applicable) the Picture (in whole or in part) in any and all forms, manner and media, whether now known or hereafter devised, in perpetuity and throughout the universe in all languages in such a manner and to the extent, if at all, as Company in its sole and unfettered discretion shall determine.  If any of such results and proceeds are not deemed a "work-made-for-hire," Producer hereby presently assigns all such rights to Company. Producer hereby grants to Company all "rental" and "lending" rights and confirms that the compensation payable hereunder includes equitable remuneration for such rights. Producer expressly waives the benefits of any so-called "droit moral" or any similar law or provision.  All of Company's rights under this Agreement shall vest in Company immediately and shall remain perpetually vested in Company, its successors and assigns, whether this Agreement expires in its normal course or is terminated in whole or in part for any reason whatsoever.

       (b)  Nothing in this Agreement shall require Company to distribute or cause or seek to cause any distribution of the Picture, and Company shall have discharged fully its obligations hereunder by paying to Producer the sums herein provided in accordance with the terms hereof.  Company may distribute or cause the distribution of the Picture upon such terms and conditions as Company may determine in its sole and absolute discretion, and without obtaining any approvals or consents from Producer or any other person.

       (c)  Producer has, and shall have, no right, title, or interest of any nature whatsoever in the Picture, any underlying literary, dramatic or musical materials contained in or upon which the Picture is or may be based (including, without limitation, the script), any future productions or other derivative works based on or derived from the Picture or any of said underlying materials, or any element or aspect of any of the foregoing.  Concurrently with the execution hereof, Producer shall execute and deliver to Company a memorandum of exclusive rights in the form attached hereto and hereby incorporated herein.

3.     <u>PRODUCTION FINANCING AND COMPENSATION</u>

Subject to such deductions and withholdings as are required pursuant to any applicable law or regulation and on the conditions that Producer is not in material breach or default hereof and fully performs all of its obligations hereunder, Company hereby agrees as follows:

(a) <u>Production Advances</u>:  To advance to Producer for production of the Picture in accordance with the Budget, production advances (the "Production Advances").  The Production Advances shall be payable pursuant to a schedule to be determined by Company in good faith taking into consideration Producer's cash flow requirements under the Budget.

(b) <u>Producer Fee</u>:  To pay to Producer the amount referenced in the Budget as Producer's producer fee in accordance with the approved cash flow schedule.

4.     <u>EXPENSES, UNION PAYMENTS AND PROFIT PARTICIPATIONS</u>

(a) <u>Expenses</u>:  Producer shall pay all costs and expenses in connection with the production of the Picture and the delivery of the Delivery Items, including, without limitation, all fees, compensation and expenses due in connection with the services of all above-the-line and below-the line personnel engaged or employed in connection with the Picture, and obtaining all underlying rights, licenses, clearances or permissions, including licenses for music synchronization, music performance and literary, comedic, dramatic and other material (except as otherwise owned or controlled by Company).

(b) <u>No Guild Agreements</u>:  Neither the Picture nor Company shall be subject to any guild or union, unless Company agrees in writing in advance.

(c) <u>No Profit Participations</u>:  No profit participations of any kind shall be payable to Producer or any person or entity engaged by Producer, unless Company agrees in writing in advance.

5.     <u>INSURANCE</u>

Company agrees to obtain and maintain those insurance policies which are customarily maintained by producers of motion pictures in the United States, including a package of general comprehensive liability insurance, E&O insurance, third party property damage insurance and workers' compensation insurance, and shall have Producer, Scott Rosenbaum and Tony Grazia covered as additional insureds.  Producer agrees to assist Company in obtaining such insurance policies.

6.     <u>PRODUCER'S WARRANTIES, REPRESENTATIONS AND COVENANTS</u>

Producer hereby warrants, represents and covenants to Company as follows:

(a) Producer is a duly organized and existing corporation and is presently in good standing under the laws of the state of its incorporation.

(b) The consent of no other person or entity is necessary for Producer to enter into and fully perform this Agreement and Producer has not done and will not do any act and has not made and will not make any grant, assignment or agreement which will or might conflict or interfere with the complete enjoyment of all of Company's rights hereunder.

4

(c)  Producer has entered into or will enter into valid and binding written employment agreements with all persons rendering services in connection with the Picture.  Any and all services rendered by said persons shall be furnished and rendered as employees-for-hire of Producer who, as said persons' employer, shall have and fulfill all responsibilities of an employer, including without limitation those arising under any workers' compensation laws and other legal requirement or any applicable Guild Agreement; and the results and proceeds of all said persons' services shall be "works-made-for-hire" and shall be properly treated and designated as such in said persons' employment agreements with Producer.  Except as expressly set forth to the contrary in this Agreement, Producer hereby agrees to make or cause to be made when due all payments of compensation which may be required to be remitted to persons or entities rendering services or furnishing equipment, facilities, rights or other material to Producer in connection with the Picture and to make such deductions and withholdings from and payment on account of such compensation (including without limitation all payments of taxes and other contributions which have arisen or may arise out of the services to be rendered or the equipment, facilities, rights or other material to be furnished by any of said persons and entities in connection with the Picture) as are required or permitted to be deducted and withheld from or paid on account of compensation paid to said persons and entities under the provisions of applicable laws or regulations or Guild Agreements.

(d)  No agreements entered into by Producer in connection with the Picture shall provide for the payment of any residuals, royalties or other payments with respect to the distribution, broadcast, exhibition or any other exploitation of the Picture in excess of the applicable minimum scale, if any, required to be paid by the terms of the applicable union agreement for such distribution, broadcast, exhibition or other exploitation; provided it is acknowledged and agreed that the Picture shall not be subject to any union without Company's prior written consent.

(e)  The Picture shall be of at least the same quality and have at least the same production standards as comparably budgeted and scheduled documentary motion pictures being produced in the Los Angeles, California area.

(f)  Neither the Picture, nor any constituent element thereof (including without limitation the title) (but excluding any material owned or controlled by Company and provided to Producer for use in the Picture) nor the exercise by Company, or any party authorized by Company, of any rights granted to or agreed to be granted to or vested in Company hereunder, shall violate the right of privacy or publicity of, any so-called "moral rights" of, defame, or infringe any copyright, trademark, service mark, common law or other right of any person, firm or corporation, or violate any other applicable law or regulation or the terms of any agreement that Producer has or will enter into.

(g)  The Delivery Items shall be delivered by Producer to Company on or before the Delivery Dates and shall be of a commercially acceptable technical quality.

(h)  Producer has the right to enter into this Agreement, to grant the rights herein granted and to perform fully all of its obligations and agreements hereunder; Producer will acquire all rights necessary to vest in and grant to Company all rights vested in and granted or agreed to be granted to Company hereunder (and will at Company's request deliver to Company copies of all such documents as evidence of Producer's acquisition of such rights) including, without limitation, all copyrights, music performance rights, music synchronization rights, still photo, film or videotape footage licenses or other appropriate license of all elements of the Picture (other than those Elements owned or controlled by Company), or such constituent

5

elements as are owned by Producer, or are in the public domain.  Producer shall furnish to Company a music cue sheet with respect to any and all musical compositions contained in the Picture, which cue sheet shall list the titles of such compositions and the writers and publishers thereof.  With respect to each composition used in the Picture, the Performing Rights necessary for exhibition of the Picture are:  (i) controlled by American Society of Composers, Authors and Publishers ASCAP or SESAC, (ii) in the public domain or (iii) owned by or licensed to Producer. Company may replace any composition in the Picture if during the term of the copyright a Performing Rights license from any such performing rights society for such composition cannot be obtained or maintained as may be necessary for Company's distribution of the Picture hereunder.

(i)  This Agreement is not and will not be subject to any claim against Company for fees or commissions by any agent or representative of Producer or any other person or entity.

(j)  Producer shall not violate any Guild Agreement or governmental rule, regulation, law, statute or ordinance in connection with the development, production or delivery of the Picture hereunder.

7.    COMPANY'S WARRANTIES, REPRESENTATIONS AND COVENANTS

Company hereby warrants, represents and covenants to Producer as follows:

(a)  Company is a duly organized and existing corporation and is presently in good standing under the laws of the state of its incorporation.

(b)  The consent of no other person or entity is necessary for Company to enter into and fully perform this Agreement.

8.    CONFIDENTIALITY

Producer acknowledges that the subject matter of the Picture is of a confidential nature. Producer shall not issue, or authorize or permit the issuance of, any publicity or grant any interview or make any statements relating to Company, the Picture or Producer's services under this Agreement unless the same are first approved in writing by Company.  "Confidential Information" means such information (irrespective of the form and/or timing of communication) as is deemed by Company to be proprietary and is disclosed to Producer or Producer's Representatives (as defined below), or becomes known to Producer or Producer's Representatives, as a consequence of or through Producer's past, present, or future relationship or engagement with Company, including, without limitation, any information prepared by Producer or Producer's Representatives that contains (or is based on), in whole or in part, any such information, and specifically including, without limitation, interviews, research, facts, documents, writings, notes and other information and materials related to the subject matter of the Picture. "Producer's Representatives" means all of Producer's directors, officers, employees, subcontractors, representatives, agents, and those engaged by Producer in connection with the Picture.  Except as required in connection with the performance of Producer's obligations under this Agreement, Producer will not (and Producer will cause the Producer's Representatives not to), either during or after the term of this Agreement, use, publish, disseminate, distribute or otherwise disclose any Confidential Information without Company's prior written consent.  Producer will (and Producer will cause the Producer's Representatives to) take all steps necessary and/or reasonably requested by Company to ensure that all such Confidential Information is kept confidential and is held in trust in a fiduciary capacity for the sole use and benefit of Company. The provisions of this section will survive the expiration or earlier

6

termination of this Agreement.  Producer has executed, or will execute concurrently with the execution of this Agreement, Company's standard Non-Disclosure Agreement, which is hereby incorporated herein.

9.    CREDIT, ADVERTISING AND PROMOTION

(a)  The Picture shall contain the credits set forth in Exhibit ___ attached hereto. The Picture shall contain no commercial or promotional credits not approved in writing by Company.  The closing credits shall not include any logos, graphics, photographs, addresses, telephone numbers or voiceover mentions unless the same have been approved in writing by Company.  No casual or inadvertent failure by Company to comply with the credit provisions hereof (by reason of shortage of time or otherwise), nor any failure by any third party to comply with such credit provisions, shall constitute a breach by Company of this Agreement.

(b)  Producer shall not agree to accord any credits in connection with the Picture without Company's prior written consent.  Producer shall deliver to Company, prior to delivery of the Picture, a complete statement (the "Producer's Statement") setting forth the credits to be accorded to all persons and entities in connection with the Picture.  Company shall be entitled to rely entirely upon the Producer's Statement, and Producer shall defend, indemnify and hold Company harmless (at Producer's own expense) against any claim, action or proceeding (or any costs, fees or expenses incurred in connection therewith) alleging any improper or insufficient credit accorded to any person, firm or corporation.

(c)  Throughout the term of copyright in the Picture and without limiting the generality of Section 2, above, Company shall have the right and may grant others the right:

(i)    to use Producer's name and the name of any person rendering services or furnishing any material in connection with the Picture or appearing in any of the Picture, as well as Producer's and such person's biography, photograph, likeness and recorded voice for information purposes and to advertise, promote and publicize the Picture and Company, but not as an endorsement of any product or other service;

(ii)    to use for information purposes and to advertise, promote, package and publicize the Picture and Company, photographs taken of and during the production of the Picture; and

(iii)    to produce, own and exploit by all means, uses or media a motion picture and/or television Picture concerning the production of the Picture subject to payment by Company of sums required solely by reason of such further exploitation pursuant to any union agreements or pursuant to third party agreements assigned to and assumed by Company in writing.

(d)  Prior to the Delivery Date, Producer shall make available to Company portions of the Picture selected by Company in its sole discretion from the rough cut for Company's use in preparing on-air promotional spots and/or a trailer or trailers in connection with the promotion of the Picture and/or Company.  At Company's request, Producer shall assist Company in the preparation of such promotional spots and trailers.

(e)  Except as otherwise expressly provided to the contrary herein, Producer shall obtain all rights, releases and licenses necessary for Company's exercise of any of Company's rights pursuant to this-paragraph, and Producer shall defend, indemnify and hold Company harmless (at Producer's own expense) against any claim, action or proceeding (or any costs, fees

7

or expenses, whether or not incurred in the course of litigation and whether or not incurred by Company in enforcing this Agreement against Producer) arising out of or in connection with any exercise by Company of such rights.

(f)  Producer shall not publish or cause the publication of any announcement, advertisement, promotional or publicity statement or other statement in connection with the Picture or the production or exploitation thereof.

10.   INDEMNIFICATION

Producer agrees to indemnify, defend and hold Company, its members, managers, officers, employees, partners, successors, licensees, agents, attorneys and assigns harmless from and against any and all judgments, liabilities, claims, damages, costs and expenses (including reasonable attorneys' fees) in connection with or resulting from any breach or alleged breach of any representation, warranty, or agreement made by Producer contained in this Agreement.

Company agrees to indemnify, defend and hold Producer, its members, managers, officers, employees, partners, successors, licensees, agents, attorneys and assigns harmless from and against any and all judgments, liabilities, claims, damages, costs and expenses (including reasonable attorneys' fees) in connection with or arising out of the distribution or other exploitation of the Picture, provided that such indemnity will not apply to such judgments, liabilities, claims, damages, costs or expenses for which Company is entitled to indemnification from Producer hereunder.

11.   EARLY TERMINATION; NONCONFORMING DELIVERY

(a)  If Producer shall be prevented or delayed in the production or delivery of the Picture because of any accident, riot, strike, epidemic or act of God, or any similar condition beyond Producer's control (an event of "*force majeure*") the delivery requirements of this Agreement (including the Delivery Date) shall be suspended during the period of such event of *force majeure*.  If such event or events of *force majeure* continue for an aggregate period of sixty (60) days or longer, Company may elect, at its sole option, in addition to its other rights and remedies in law, in equity and otherwise, the terms set forth in subparagraph (d) below of this Paragraph.

(b)  If Producer shall be in material breach or material default (including, without limitation, anticipatory breach) of this Agreement, which breach or default relates to Producer's ability to produce and deliver the Picture in timely fashion and according to all of the other terms of this Agreement (including, without limitation, material nonconformity according to the terms of this Agreement), and such breach or default shall not have been corrected within thirty (30) days after notice by Company to Producer thereof, Company may elect, at its sole option, in addition to its other rights and remedies in law, equity and otherwise, the terms of subparagraph (d) below of this Paragraph.

(c)  If Producer is enjoined or restrained by court order from conducting all or any part of its business affairs relating to the production of the Picture and Producer's ability to produce the Picture thereby is materially impaired; or if all or a substantial part of Producer's property is attached, seized, levied upon, or comes under the possession of a receiver, trustee or assignee for the benefit of creditors, and such attachment, seizure or levy, etc. is not promptly lifted; or if any proceeding is filed by or against Producer for bankruptcy, dissolution or liquidation; or if Producer is insolvent or unable to pay its debts as they mature, then Company

may elect, at its sole option, in addition to its other rights and remedies in law, equity or otherwise, the terms set forth in subparagraph (d) below of this Paragraph.

(d) Pursuant to the terms of subparagraphs (a), (b) or (c) of this Paragraph, Company may elect the following:

(i)     Producer shall promptly repay to Company any and all amounts paid or reimbursed to Producer pursuant to this Agreement which have not been expended by Producer prior to the date of Company's election. Producer shall account to Company in writing within twenty-five (25) days of Company's election for any amounts expended.

(ii)     Producer shall promptly deliver all elements of the Picture (whenever produced and in whatever stage of production) produced or in production prior to Company's election and all appropriate licenses, agreements or rights in such elements to Company, and Company shall have the right, but not the obligation, to complete production of the Picture. In this regard, immediately following Company's election, Producer shall assign to Company, at Company's option, any and all such agreements relating to the Picture (including, without limitation, any agreements with persons or entities rendering or furnishing services in connection with the Picture).

(iii)     All rights of Producer, including, without limitation, the right to produce the Picture pursuant to Paragraph 1, above, under this Agreement other than as set forth in this subparagraph (d) shall be terminated.

(e) Either party may terminate this Agreement by giving the other party fifteen (15) days prior written notice, and the terms of subparagraph (d) of this Paragraph shall apply. In such event, both parties will work together in good faith during said 15-day period, as well as after said 15-day period (if necessary or desirable), to assure a smooth transition. Notwithstanding anything in this Agreement to the contrary, any termination of this Agreement (however occasioned) shall not affect the coming into force or the continuance in force of any provision hereof which is expressly or by implication intended to come into or continue in force on or after such termination. In particular, the provisions of the following paragraphs shall survive the termination of this Agreement: Ownership and Copyright; Insurance; Warranties, Representations and Covenants; Confidentiality; Credit, Advertising and Promotion; Indemnification; and 13(a) Waiver of Equitable Relief. Notwithstanding anything in this Agreement to the contrary, Producer, Scott Rosenbaum and Tony Grazia shall have the right to elect to have their names and credits removed from the Picture and all related materials and listings, whether or not this Agreement is terminated early.

12.    <u>NOTICES</u>

All notices, statements or other documents which either party is required or desires to give to the other party must be in writing and be sent to the other party at the address indicated below, and must be either personally delivered or sent through the United States mail registered or certified mail, or by facsimile or email (with a confirmation copy sent by mail), or by Federal Express or other comparable overnight courier service. The parties' addresses are:

9

<u>PRODUCER</u>
Red Hawk Films, Inc.
116 Bacon Road
Old Westbury, NY 11568
Attn: Scott Rosenbaum
scott@redhawkfilms.com

<u>COMPANY</u>
Unlucky Film, Inc.
1098 Ann Arbor Rd. W
Suite 330
Plymouth, MI 48170
Attn: Timothy Mucciante
mucciante@medicimedia.org

<u>WITH A COPY TO</u>
Law Offices of Kim H. Swartz
Attn: Kim H. Swartz, Esq.
Via email:  khs@KimHSwartz.com

       Notice shall be deemed given when sent pursuant to this paragraph.  All payments made to Producer hereunder shall be sent to Producer at the notice address stated above.

13.    <u>MISCELLANEOUS</u>

    (a)  Rights granted or agreed to be granted to Company hereunder shall be irrevocably vested in Company, and Producer's sole remedy, in the event of a breach hereof by Company, shall be the right to seek money damages incurred as a result of such breach.  In no event shall Producer have the right to injunctive or other equitable relief or to terminate or rescind this Agreement or the rights herein granted or to in any way enjoin or restrain the production, distribution, advertising or other exploitation of the Picture.

    (b)  Producer agrees that Company and its assignees shall have the right to assign this Agreement, in whole or in part, or any of Company's rights or obligations hereunder, at any time to any party.  Producer shall not have the right to assign this Agreement.

    (c)  At Company's request, Producer shall promptly execute or cause the execution of all additional documents, and perform or cause the performance of any other acts, which Company may reasonably deem necessary or desirable to effectuate the purposes of this Agreement, including executing concurrently with the execution of this Agreement the attached Memorandum of Exclusive Rights.  Upon Producer's failure to do so promptly, Producer appoints Company as its attorney-in-fact for such purposes (it being acknowledged that such appointment is irrevocable and shall be deemed a power coupled with an interest), with full power to execute and deliver such documents and with full powers of substitution and delegation.

    (d)  This Agreement contains the full and complete understanding between Producer and Company with reference to the within subject matter, supersedes all prior agreements and understandings whether written or oral pertaining thereto, and cannot be modified except by a written instrument signed on behalf of both Producer and Company.  This Agreement may be executed in counterparts and may be executed and delivered electronically.

    (e)  This Agreement shall be governed by and construed in accordance with the laws of the State of California applicable to agreements executed and to be wholly performed therein, without giving effect to any principles regarding choice of laws.  Except as it relates to injunctive relief, any controversy or claim arising out of or in relation to this Agreement or the

10

validity, construction or performance of this Agreement, or the breach thereof, shall be resolved by arbitration before and in accordance with the rules of the American Arbitration Association under its jurisdiction in Wayne County, Michigan before a single arbitrator familiar with entertainment law.  The parties shall have the right to engage in pre-hearing discovery in connection with such arbitration proceedings.  The parties agree that they will abide by and perform any award rendered in any arbitration conducted pursuant hereto, that any court having jurisdiction thereof may issue a judgment based upon such award and that the prevailing party in such arbitration and/or confirmation proceeding shall be entitled to recover its reasonable outside attorneys' fees and expenses. The arbitration will be held in Wayne County, Michigan and any award shall be final, binding and non-appealable.  The parties agree to accept service of process in accordance with the AAA rules.  Any actions arising from this Agreement relating to injunctive relief shall be commenced and prosecuted only in the courts of the State of Michigan, in Wayne County, or the federal courts within Wayne County, which courts shall have exclusive jurisdiction thereof.  Each party agrees not to contest the personal jurisdiction of these courts and the prevailing party in such actions shall be entitled to recover from the non-prevailing party the cost of reasonable outside attorneys' fees and expenses incurred.

(f)  In the event that there is a conflict between any provision of this Agreement and any statute, law, regulation, or any applicable and binding collective bargaining agreement, the latter shall prevail; provided, however, that in such event, the provision of this Agreement so affected shall be curtailed and limited only to the minimum extent necessary to permit compliance with the minimum requirement; no other provisions of this Agreement shall be affected thereby and all such other provisions shall continue in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first hereinabove written.

UNLUCKY FILM, INC.
(Company)

By: _____
Its: __ President _____

RED HAWK FILMS, INC.
(Producer)

By: _scott rosenbaum_____
Its: __Manager_____

11

<u>MEMORANDUM OF EXCLUSIVE RIGHTS</u>

The undersigned, Red Hawk Films, Inc. ("Producer") hereby certifies that the motion picture to be produced by Producer (the "Picture") presently entitled "Unlucky" (and all constituent elements thereof) will be produced as and are to be considered works-made-for-hire for Unlucky Film, Inc. ("Company") and that Company is entitled to all copyrights in and to the Picture.

Without limiting the foregoing, for good and valuable consideration, receipt of which is hereby acknowledged, Producer has assigned and hereby assigns, exclusively and irrevocably, free and clear of any lien or obligation, to Company, its successors, licensees, and assigns, all right, title, and interest in the Picture, including, without limitation, all copyrights therein in the United States and throughout the rest of the world, together with any and all present or future claims and causes of action against third parties related to the Picture and such rights and copyrights.

As of September 1, 2021, Producer and Company entered into a production agreement relating to the foregoing rights.  This instrument is expressly made subject to all of the terms, conditions, and provisions set forth in such agreement.

IN WITNESS WHEREOF, the undersigned has caused these presents to be signed by its duly authorized officer on September 1, 2021.

RED HAWK FILMS, INC.
(Producer)

By: *scott rosenbaum*

Name: scott rosenbaum

Title: manager

EXHIBIT 8

Invoices



**Red Hawk Films**
**116 BACON ROAD**
**OLD WESTBURY NY 11568**
**Fed ID: 20-2630284**
**PH: 516.459.1846**
**scott@redhawkfilms.com**

**INVOICE**

Invoice:100421

October 4, 2021

TO: Mr. Timothy Mucciante
President – Medicci Media
2055 Walton Rd
St. Louis, MO 63114

For: Production Services related to the filming of the documentary feature film titled, *Unlucky*.

Rate for services: $20,290.00 (see Attached Budget)

Expenses:

AMOUNT DUE: $20,290.00

Please make check payable to: Red Hawk Films, Inc.
Venmo - @Scott-Rosenbaum-9
Wire instructions: Red Hawk Films, Inc. – Acct. 720938759 – ABA 201000021



**Red Hawk Films**
**116 BACON ROAD**
**OLD WESTBURY NY 11568**
**Fed ID: 20-2630284**
**PH: 516.459.1846**
**scott@redhawkfilms.com**

**INVOICE**

Invoice:111221

November 12, 2021

TO: Unlucky Film, Inc.
Att: Mr. Timothy Mucciante
President
1098 Ann Arbor Road
Suite 330, Plymouth, MI 48170

For: Advance against budget for October - November 2021

| | |
|---|---|
| DIRECTOR | $25,000 |
| PRODUCER | $17,500 |
| COPRODUCERS | $ 5,000 |
| SHOOT (ESTIMATE WEEK NOVEMBER 14TH) | $15,000 |
| EDITOR (4 WEEKS $3,200 PER WEEK) | $12,800 |
| REDHAWK FEE | $18,750 |

Expenses:

AMOUNT DUE: $94,050

Please make check payable to: Red Hawk Films, Inc.
Venmo - @Scott-Rosenbaum-9
Wire instructions: Red Hawk Films, Inc. – Acct. 720938759 – ABA 201000021



**Red Hawk Films**
**116 BACON ROAD**
**OLD WESTBURY NY 11568**
**Fed ID: 20-2630284**
**PH: 516.459.1846**
**scott@redhawkfilms.com**

**INVOICE**

Invoice:120621

December 6, 2021

TO: Unlucky Film, Inc.
Att: Mr. Timothy Mucciante
President
1098 Ann Arbor Road
Suite 330, Plymouth, MI 48170

For: Advance against budget for December 2021

| | |
|---|---|
| DIRECTOR | $12,500 |
| PRODUCER | $8,750 |
| COPRODUCERS | $12,500 |
| SHOOT (ESTIMATE December) | $10,000 |
| EDITOR (4 WEEKS $3,200 PER WEEK) | $12,800 |
| REDHAWK FEE | $9,375 |
| PRODUCTION ACCOUNTANT | $2,000 |
| ARCHIVAL RESEARCH | $5,000 |

AMOUNT DUE: $72,935.00

Wire instructions: Red Hawk Films, Inc. – Acct. 779202305 – ABA 021000021

# EXHIBIT 9

# Declaration of Scott Rosenbaum

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **UNLUCKY FILM INC.,** | **2:24-CV-10149-TGB-EAS** |
| Plaintiff, | HON. TERRENCE G. BERG |
| vs. | |
| **RED HAWK FILMS, INC.,** | |
| Defendant. | |

## DECLARATION OF SCOTT ROSENBAUM

I, Scott Rosenbaum, hereby declare as follows:

1.      I am over eighteen years of age and have personal knowledge of the facts stated in this Declaration. All facts stated in this Declaration are true and correct to the best of my knowledge.

2.      I am the sole owner of Defendant / Counter-Plaintiff Red Hawk Films, Inc. ("Red Hawk"). Red Hawk is a New York corporation with its principal place of business located in New York.

**The Production Services Agreement and Unlucky's Default**

3.      Red Hawk and Unlucky entered into a Production Services Agreement ("Contract") dated as of September 1, 2021.

4.      The subject of the Picture was to be the exoneration of Anthony Broadwater after he was falsely accused and imprisoned for rape. Time was a critical factor in producing the Picture as court

proceedings were on-going in October through December of 2021, and the parties intended that the Picture include video of the court proceedings and witness interviews contemporaneous with the court proceedings.

5.    As contemplated by the Contract, Red Hawk produced a detailed budget dated October 12, 2021, which was approved by Unlucky ("Budget"). The Budget included $1,157,475 in total costs, expenses and compensation for Red Hawk, including a $100,000 director fee and a $75,000 fee for Red Hawk's production services.

6.    The Contract provided that all costs and expenses of production were to be advanced by Unlucky to permit Red Hawk to make timely payments.

7.    Red Hawk submitted its advance fee payment requests in the form of the invoices attached to Red Hawk's Response ("Response") to Unlucky's Motion for Preliminary Injunction ("Motion"):

   a. October 4, 2021: Invoice 100421 - $20,290;

   b. November 12, 2021: Invoice 111221 - $94,050; and

   c. December 6, 2021: Invoice 120621 - $72,935 (collectively, "Invoices").

8.    Unlucky did not object to the Invoices, with the exception of only two line items for Co-producers.

9.     Unlucky made multiple promises that payment would be made, both orally and through text messages. The text messages attached to the Response are accurate copies of text messages between myself and Timothy Mucciante, the owner of Unlucky.

10.     Because of Mucciante's false promises that payment was forthcoming, Red Hawk spent its own funds to cover production costs and expenses, and continued working to produce the Picture.

11.     Through the end of December 2021, Red Hawk had shot roughly twenty hours of video to the best of my recollection. I had only reviewed a portion of the video before production was stopped.

12.     Unlucky paid the October 2021 invoice in the amount of $20,290, but made no payments in November. In December 2021, Unlucky made partial payment of $69,603.12 and made a direct payment to Red Hawk's editor in the amount of $12,800, all of which were applied by Red Hawk against the Invoices. Upon information and belief, Unlucky may have made additional direct payments but none of these other payments related to the amounts invoiced by Red Hawk and are not applicable to Red Hawk's Invoices.

13.     After application of these payments, Unlucky still owed an outstanding balance of $84,581.88 for Red Hawk's work and out of pocket expenses through December 2021.

14.    Unlucky refused to make any additional payments to Red Hawk and refused to advance any additional funds for production work for January 2022.

15.    Due to Unlucky's failure to pay arrears and advance additional funds for production expenses, Red Hawk canceled all production activities for January 2022.

16.    Hoping that the project could be still be salvaged, I worked with a contract producer to ensure there would be no cancelation costs but also to permit production to restart if payment was received from Unlucky.

17.    Charges for the month of January, after deducting all anticipating costs that were canceled and not actually incurred, totaled $30,625.

18.    On February 2, 2022, after another full month without payment from Unlucky, I sent correspondence on behalf of Red Hawk to Mucciante on behalf of Unlucky providing formal notice of Unlucky's default of its obligations under the Contract and that the Contract would be terminated as of February 11, 2022 if payment was not received before that date.

19.    No payments were received from Unlucky by February 11, 2022 or at any time thereafter.

4

## Response to False Allegations Stated in Mucciante's Declaration

20.     Red Hawk received no more than $89,893.12 from Unlucky. The only expense that I am aware of that was paid directly by Unlucky that is applicable to any of the Invoices is a total of $12,800 paid to Borzu Mehrad, an editor working with Red Hawk.

21.     Red Hawk prepared and delivered the Budget to Unlucky before shooting of any video commenced. Unlucky was fully aware that production costs were expected to exceed $1 million.

22.     Red Hawk kept Mucciante apprised at all times regarding the costs and fees incurred in production of the Picture.

23.     Mucciante and Unlucky did not demand detailed cost reports until after Mucciante had repeatedly promised but failed to make agreed-upon payments and advances to Red Hawk.

24.     Red Hawk provided Unlucky with detailed cost reports prepared by an accountant.

25.     None of the costs or expenses were for "employees with essentially 'no-show' type jobs." Each person employed by Red Hawk for the Picture was highly qualified and employed for a specific purpose. Red Hawk consulted with Mucciante and Mucciante was fully aware of the individuals employed by Red Hawk and the intended purpose that they served with respect to the Picture.

5

26.    I never, and to the best of my knowledge, Mr. Grazia never admitted or otherwise stated that any employees, consultants or contractors were "token" hires or hired to achieve the appearance of diversity and to check boxes. Mucciante expressed a desire to avoid the Picture being perceived as having a "white savior" complex. Accordingly, it was important to both Red Hawk and Unlucky that the Picture incorporate the perspective of minority individuals.

27.    Unlucky did not terminate the Contract on February 1, 2022. Red Hawk received correspondence dated February 23, 2022 purporting to terminate the Contract, but the Contract had already been terminated by Red Hawk due to Unlucky's failure to make payments as required.

28.    Neither I, Red Hawk or, to the best of my knowledge, information and belief, anyone employed by or contracted with Red Hawk has provided any of the film footage relating to the Picture to anyone other than Mr. Mehrad in his role as an editor.

29.    Neither I, Red Hawk or, to the best of my knowledge, information and belief, anyone employed by or contracted with Red Hawk has in any way "shopped" any of film footage relating to the Picture.

30.    Neither I, Red Hawk or, to the best of my knowledge, information and belief, anyone employed by or contracted with Red

6

Hawk has provided any links or hyperlinks to third parties consisting of any film footage relating to the Picture.

31.  Red Hawk is not working with Jigsaw, HBO or any other party to develop a competing non-fiction documentary film project about Mr. Broadwater.

32.  The Picture was never produced. Instead, Red Hawk shot roughly twenty hours of raw and unedited video which Red Hawk had anticipated would form part of the raw material that would be used to produce the Picture. Most of the video has never been reviewed and the total number of hours is my best estimate only.

33.  Red Hawk has at all times kept the hard drives on which the video is stored safe and has not deleted or lost any of the video relating to the Contract or the Picture.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge, information and belief.

Executed on March 18, 2024 in Glen Head, New York.

Scott Rosenbaum

7

EXHIBIT 10

Text Messages



To: +1 (917) 514-6075,   +1 (312) 848-3338

Mon, Dec 6, 4:06 PM

+1 (312) 848-3338
Do we have an email for Bo?

Actually nm.

Checked with bank. They don't see the ach – as mentioned my banker isn't in so it was the general line but

+1 (312) 848-3338
Ok. Just keep checking.

Will do

First ach just hit.

+1 (312) 848-3338
Goodness

🙏

Independent Bank - ACH Payme...

You should have that in the morning. The second one should've hit right after the first one that is for 22,300. I don't know why they selected these weird amounts.

Ok. Just the first so far.

Tue, Dec 7, 3:26 PM

Tim as you have conversations with Anthony, please pursue any friends or local family that we can get as well. That's still a hole in our story.

+1 (312) 848-3338
Ok

Only that one first deposit this far. FYI.

+1 (312) 848-3338
I just spoke to the bank. She told me they were received. I asked her to track. She told me that Bo received his money as well. Is that accurate or not?

+1 (917) 514-6075
Yes he got it! Thanks

Screenshot

To: +1 (917) 514-6075,   +1 (312) 848-3338

Tim as of now nothing has hit.

+1 (312) 848-3338
OK. There's not much else I can do from my end. They were definitely sent.

Ok. It will show up.

+1 (312) 848-3338
I'm sorry about this, but I have done everything I can on my end. The new account is in the process of being opened and should be fully active by tomorrow.

It's all good.  We'll be fine.

+1 (312) 848-3338
Out of an abundance of caution I checked with the bank. Everything is still on track.

I appreciate it.

They are starting to show up.  The second one landed. The third shows pending.

+1 (312) 848-3338
Ok

Thu, Dec 9, 3:45 PM

Tim – update us on your thoughts on additional interview possibilities- police captain, family, friends ? I'd love to maximize that theater.

+1 (312) 848-3338
Yes to the police captain. Who do you want to take lead on Anthony's casinos and brother?

How about Sgt. Lorenz widow?

Great about the captain. I need info to formulate questions for him. Advise. . If he can do it Tuesday afternoon (before three – say 2 pm start) that would be great and likely sidelines our family needs.

Does Sgt Lorenz's wife want to speak?

+1 (312) 848-3338
She spoke to the NYT, so i am thinking yes.

She did? I missed that one. Can you send that to me?
Also confirming you and Tess are vaxed. The theater is requiring it plus a negative test which we will have to purchase some at home kits.

+1 (312) 848-3338
Tess cannot come but we are both maxed.

Ok.

+1 (312) 848-3338
That article has not come out yet.

Oh. Ok.  Curious what she had to say.



To: +1 (917) 514-6075,   +1 (312) 848-3338

Ok. i only need the content. I plan to recreate the interaction in the film

+1 (312) 848-3338
Ok

Fri, Dec 10, 9:11 AM

Tim just keeping you updated – the remaining two ACH transfers still have not hit

+1 (312) 848-3338
OK. I just checked the account and both show has been delivered yesterday. I will call the bank. Are they showing pending on your end?

No.

+1 (312) 848-3338
Ok

Yesterday you texted that you received the second one and the third was pending, but this morning you have not received any further funds and nothing is pending?

That was a mistake. The second one that "hit" the account and appears in the balance also showed as pending at that time. I mistook the pending for a third.

+1 (312) 848-3338
Ok. Understood.

They are looking into it.

Thank you

Fri, Dec 10, 11:06 AM

Just spoke to the bank again. It was take them several more hours to sort this out. I do not understand this – Bo's transfer went through relatively fluidly. Anyway I am scheduled to speak with the bank again at 12:55pm

I have a call with my banker who is just back too. Waiting for him to call me back. Yes it's very unusual. I sent an Ach to tony for his fee late yesterday afternoon and it hit overnight.

+1 (312) 848-3338
Wow

Yeah. Something has to be wrong at that bank

+1 (312) 848-3338
Well the new bank account for unlucky will be activated sometime today in terms of the wire transfer capability. In the worst-case scenario I'll do a regular wire transfer for the remaining amount and for the new invoice out of that account.

Just hung up with my banker at chase. As expected there's nothing he could do unless it was being held up by chase for some reason which it does not appear to be.

+1 (312) 848-3338
Ok.

To: +1 (917) 514-6075,   +1 (312) 848-3338



Thu, Dec 16, 8:08 AM

Good morning, Tim. Just a heads up – that last Ach still has not hit.

+1 (312) 848-3338
Yes it is still at ACH. I've been in communication with the bank manager to see what needs to be done to get it pried loose.

Ok.   Thank you.

+1 (917) 514-6075
That's great!
When will the December wire be sent????
Thanks

+1 (312) 848-3338
I tried to do it yesterday, but could not sign on. I have to call tech support at the new bank today.

+1 (917) 514-6075

😊

+1 (312) 848-3338
I was on hold for tech-support for over an hour yesterday. I just didn't have the patience to call back.

Thu, Dec 16, 1:04 PM





To: +1 (917) 514-6075,   +1 (312) 848-3338

Very interesting. I bet it was.

Fri, Dec 17, 10:46 AM

+1 (312) 848-3338
What is the 24,500 transfer received this morning?

Not as of yet.

+1 (312) 848-3338
Ok

Fri, Dec 17, 12:29 PM

+1 (917) 514-6075
Did the wire for December go out???

Thanks

+1 (312) 848-3338
I sent it out this morning. I have not been able to sign on to check the status as I am not near my laptop. I will be able to shortly. I still have to pay the insurance bill.

+1 (917) 514-6075
Thanks 😊

+1 (312) 848-3338
It is still pending review. This is not unusual with new accounts and large wire transfers.

Scott have you heard from Anthony today by chance?

No. He never replied after my last request yesterday afternoon

+1 (312) 848-3338
Ok

He's MIA?

+1 (312) 848-3338
Just have not heard from him.

He's probably out delivering turkeys 🦃

+1 (312) 848-3338
Yes, right.

Fri, Dec 17, 2:33 PM

+1 (312) 848-3338
Just received a call from the new bank, we are having a risk management review on the wire transfer at 3 PM to verify that we authorize that.

Fri, Dec 17, 3:37 PM

+1 (312) 848-3338
Just finished with the verification.

To: **+1 (917) 514-6075**,   **+1 (312) 848-3338**

Fri, Dec 17, 3:37 PM

+1 (312) 848-3338
Just finished with the verification.

How'd it go?

+1 (312) 848-3338
Sorry, I thought I completed my thought. It might get there still today otherwise first thing Monday.

Still figuring out the 24,500.

Ok.  Thank you.

+1 (917) 514-6075



Sat, Dec 18, 7:38 AM

**Inside the Alice Sebold Saga: Part II**
airmail.news

Sat, Dec 18, 9:31 AM

+1 (917) 514-6075
How you doing

+1 (312) 848-3338
I'm feeling OK. Thank you.

+1 (917) 514-6075
I got my booster yesterday
Feel ok

+1 (312) 848-3338
Very brave of you!

+1 (917) 514-6075



To: +1 (917) 514-6075,   +1 (312) 848-3338

Tue, Dec 21, 1:58 PM

+1 (312) 848-3338
Funds are moving but very slowly

Tue, Dec 21, 3:38 PM

+1 (312) 848-3338
I will hear anytime.

The ACH for the insurance is going through.

It is looking like tomorrow midday for the rest.

Wed, Dec 22, 11:07 AM

+1 (312) 848-3338
Out of an abundance of caution I have asked my bookkeeper at Medici Media UK to send out transfers in USD to Red Hawk for the invoice and the $24500.00.

Wed, Dec 22, 12:08 PM

On zoom with carlos.  Will touch add after.

*Touch Base

Wed, Dec 22, 1:37 PM

Tim I got my booster last night and needless to say I'm on my ass a bit. Will call later.  But as of now nothing has it.  Is it expected today?

Wed, Dec 22, 4:35 PM

+1 (312) 848-3338
I hope you feel better. The funds from the UK will be several days. I am hoping the US Funds hit tomorrow.

Thu, Dec 23, 11:15 AM

+1 (312) 848-3338
Just an update on funds. The UK funds have been sent, but they probably will not arrive until Monday or Tuesday of next week.
Sent with Siri

Tim, let's have a call. How's noon?

+1 (312) 848-3338
Sure.
Sent with Siri

Mon, Dec 27, 5:40 PM

+1 (917) 514-6075
No funds as of 5:40pm

+1 (312) 848-3338
I know. I've been on the phone with the bank throughout the day. And the UK funds are not scheduled to arrive until Wednesday.

Wednesday 9:47 AM

+1 (312) 848-3338

To: +1 (917) 514-6075,   +1 (312) 848-3338

Mon, Dec 27, 5:40 PM

+1 (917) 514-6075
No funds as of 5:40pm

+1 (312) 848-3338
I know. I've been on the phone with the bank throughout the day. And the UK funds are not scheduled to arrive until Wednesday.

Wednesday 9:47 AM

+1 (312) 848-3338
Scott will be receiving a verification transfer before the wire is released. When you receive the transfer, please provide to me the verification amount.

Ok. So it's expected today?

+1 (312) 848-3338
I assume so. You should have received an email regarding the verification and the date will be in there I am thinking.

Just got an email saying they wired $43.13 and that this will arriving tomorrow.

+1 (312) 848-3338
The test transfer should be there today, please keep checking your account.

Ok





To: +1 (917) 514-6075,   +1 (312) 848-3338

That's $20,000 for the year

12 months

+1 (312) 848-3338
Like I said, let's discuss it next week. For comparison, my accounting and bookkeeping costs across six companies on two continents, including all tax filings is $23,500. Let me see an example of her work and have a discussion with her and we can revisit this.

+1 (917) 514-6075
Sure

+1 (312) 848-3338
I spoke to the bank, they said "by" tomorrow, but it usually credits at the receiving bank same day. Pls keep checking your account.

Will do. Nothing as of now.

+1 (312) 848-3338
Ok

Wednesday 9:10 PM

No money as of 5pm

+1 (312) 848-3338
The email Scott got said the 30th, so I guess that's what they meant. I thought it would be there today.

Ok

Thursday 7:55 AM

+1 (312) 848-3338
Pls let me know if the verification deposit was received.

Yes. It shows pending

+1 (917) 514-6075
So when does the real wire hit? Tomorrow?

+1 (312) 848-3338
OK. I need to notify the bank, it should hit tomorrow.

What was the amount?

$43.12

+1 (312) 848-3338
OK. Thank you.

Thursday 10:46 AM

+1 (312) 848-3338
Scott can you check if that amount came in via ACH or Fedwire?

To: +1 (917) 514-6075, +1 (312) 848-3338

Thursday 10:40 AM

+1 (312) 848-3338
Scott can you check if that amount came in via ACH or Fedwire?

Nothing new has hit.

+1 (312) 848-3338
I understand that. I was referring to the $43.12.

**Recent transactions**

Digital Receipts

ORIG CO NAME:Red Badge Films CO ENTRY
DESCR:Verify SEC:WEB IND ID:284727311 ORIG ID:145...
Pending
$43.12

This is all it says and won't let me expand. I'm on my phone and have to check if I have more detail on the computer now.

Says ach credit

+1 (312) 848-3338
Ok. Thanks. I was just wondering why it took so long, because it should've been a wire. I will see if I can make sure the next one is a wire.

Ok

Thursday 5:19 PM

+1 (312) 848-3338
Have you received the notification for the next transfer from the UK?

I mean the email?

No. I've not.

Friday 9:37 AM

+1 (312) 848-3338
The bank branch in the UK is shut now, so I will not be able to follow up until Monday. We are still waiting on Comerica.

+1 (917) 514-6075
Let's all talk later this morning
It's obvious that we can keep on going without funding

Banks are closed Monday in UK

+1 (312) 848-3338
I am waiting on an X-ray for a possible kidney stone, so I will try to be available for a call, but it depends on when the call is. I dont see any choice but to wait until Tuesday for the funds to be sent, if Scott has not yet received the confirmation email.

+1 (917) 514-6075
P

EXHIBIT 11

Default Notice

RED HAWK FILMS
116 BACON ROAD
OLD WESTBURY, NY 11568

February 2, 2022

Via email mucciante@medicimedia.org and US Mail
Unlucky Film, Inc.
1098 Ann Arbor Rd. W
Suite 330
Plymouth, MI 48170
Attn: Timothy Mucciante

Via email only: khs@KimHSwartz.com
Law Offices of Kim H. Swartz
Attn: Kim H. Swartz, Esq.

       RE:    Notice of Breach of Production Services Agreement dated September 1, 2021

Dear Mr. Mucciante:

Reference is made to a certain agreement titled "Production Services Agreement" dated September 1, 2021 between Unlucky Film, Inc. ("Unlucky") and Red Hawk Films, Inc. ("Red Hawk") (the "Agreement"). Please be advised that this letter is a formal notice of material breach by Unlucky of the terms of that Agreement.

As you are undoubtedly aware, Unlucky has failed to make payments in accordance with the Agreement and its acknowledged obligations. More specifically, as of this writing, the sum of $97,435.00, which has been accounted for in its entirety by Red Hawk, remains unpaid and owing of which $24,050 has been due since October 2021. Despite our repeated demands and assurance from both you and your counsel that all of the arrearages would be paid, Red Hawk remains unacceptably unpaid. We therefore demand that Unlucky immediately remit all of the promised arrearages immediately.

Unless payment is received in full no later than February 11, 2022, we will consider the contract terminated by your breach and explore all of our legal rights including but not limited to legal proceedings necessary to recover the outstanding amount and damages without further notice. This letter is sent with a full reservation of all of our rights and remedies afforded under the law. Please guide yourself accordingly.

Very truly yours,

Scott Rosenbaum